**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

IN RE: RAIL FREIGHT FUEL
SURCHARGE ANTITRUST LITIGATION
(NO. II)

---

This document relates to:

No. 1:19-cv-03379 (BAH)
No. 1:19-cv-03516 (BAH)
No. 1:19-cv-03517 (BAH)
No. 1:19-cv-03618 (BAH)
No. 1:20-cv-00023 (BAH)
No. 1:20-cv-00328 (BAH)
No. 1:20-cv-00447 (BAH)
No. 1:20-cv-00523 (BAH)
No. 1:20-cv-00559 (BAH)
No. 1:20-cv-00790 (BAH)

MDL Docket No. 2925
Misc. No. 20-00008 (BAH)

## <u>MEMORANDUM OPINION</u>

Over 300 rail freight shippers, who are the plaintiffs in this multidistrict litigation, *In re Rail Freight Fuel Surcharge Antitrust Litigation* ("*MDL II*"), No. 20-mc-00008-BAH, MDL No. 2952 (D.D.C.), claim that defendants, the four largest railroads operating in the United States, engaged in a multi-year price-fixing conspiracy to increase the price of rail freight transport through their coordinated efforts to cause an industry trade group to adopt a new cost index that excluded the cost of fuel and then to implement, in lockstep, artificially inflated fuel surcharges, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15. This claim was originally pressed in another multidistrict litigation pending in this District, *In re Rail Freight Fuel Surcharge Antitrust Litigation* ("*MDL I*"), No. 07-mc-00489-PLF-GMH, MDL No. 1869 (D.D.C.), in which a putative class of direct purchasers of

unregulated rail freight services alleged the same conspiracy, occurring from 2003 to 2008, against the same defendants, *see, e.g.*, *In re Rail Fuel Surcharge Antitrust Litig.* ("*MDL I–D.D.C. 2012 Op.*"), 287 F.R.D. 1, 13 (D.D.C. 2012).  Certification of that class was ultimately denied. *In re Rail Freight Fuel Surcharge Antitrust Litig.—MDL No. 1869* ("*MDL I–D.C. Cir. 2019 Op.*"), 934 F.3d 619, 627 (D.C. Cir. 2019).  Former putative class members in *MDL I* have now brought ninety-two individual complaints consolidated into *MDL II*.  Ten of the complaints filed in *MDL II*, while largely repeating the claims of the putative class, introduce new factual allegations.  Specifically, these new allegations are that: (1) three additional railroads participated as co-conspirators; (2) defendants coordinated the uniform implementation of mileage-based fuel surcharges in addition to rate-based fuel surcharges; and (3) defendants' conspiratorial conduct, and its effects, transpired outside of the 2003–2008 period that defined the *MDL I* putative class.

Defendants have moved to dismiss, in whole or in part, the ten complaints on the basis of those new allegations.[1]  They argue that these complaints are wholly or partially time-barred under the Clayton Act's statute of limitations because the novel factual allegations deprive plaintiffs of the tolling generally available to former putative class members under *American Pipe & Construction Co. v. Utah* ("*American Pipe*"), 414 U.S. 538 (1974).  In the alternative, they contend that the novel factual allegations should be stricken from plaintiffs' complaints

---

[1]     *See generally* Defs.' Mot. Dismiss ArcelorMittal's Compl. ("Defs.' AM Mot."), ECF No. 106; Defs.' Mot. Dismiss Gerdau Steel's Compl. ("Defs.' Gerdau Mot."), ECF No. 107; Defs.' Mot. Dismiss Int'l Paper Co.'s Compl. ("Defs.' Int'l Paper Mot."), ECF No. 108; Defs.' Mot. Dismiss Dow's Am. Compl. ("Defs.' Dow Mot."), ECF No. 111; Defs.' Mot. Dismiss Union Carbide's Am. Compl. ("Defs.' Union Carbide Mot."), ECF No. 112; Defs.' Mot. Dismiss Compl. GenOn Energy Mgmt., LLC, GenOn Power Midwest LP, & GenOn Rema LLC ("Defs.' GenOn Mot."), ECF No. 109; Defs.' Mot. Dismiss Pls.' Compl. or, in the Alternative, Mot. Strike ("Defs.' NYK Mot."), ECF No. 196; Defs.' Mot. Partial Dismissal, or in the Alternative, Mot. Strike Compls. Pls. Kawasaki & Yang Ming ("Defs.' Kawasaki & Yang Ming Mot."), ECF No. 200; Defs.' Mot. Partial Dismissal Pls.' Am. Compl. ("Defs.' Anheuser-Busch Mot."), ECF No. 257.

because they are time-barred.  For the reasons explained below, defendants' motions to dismiss
or in the alternative, to strike, are denied.

## I.      BACKGROUND

The ten cases subject to the pending motions to dismiss were brought by plaintiffs, who
are "substantial consumers of rail freight services within the United States," Compl. ¶ 16,
*ArcelorMittal USA LLC v. CSX Transp., Inc.* ("AM Compl."), No. 19-cv-3379-BAH (D.D.C.
Nov. 8, 2019), ECF No. 1, including: (1) two steel producers, *id.* ¶¶ 14–15; Compl. ¶ 13, *Gerdau
Ameristeel Corp. v. Union Pac. R.R. Co.* ("Gerdau Compl."), No. 19-cv-03618-BAH (D.D.C.
Dec. 3, 2019), ECF No. 1; (2) a packaging, pulp, and paper manufacturer, Compl. ¶ 14, *Int'l
Paper Co. v. Union Pac. R.R. Co.* ("Int'l Paper Compl."), No. 20-cv-00023-BAH (D.D.C. Jan. 6,
2020), ECF No. 1; (3) a power producer, Compl. ¶ 14, *GenOn Energy Mgmt., LLC v. Union Pac.
R.R. Co.* ("GenOn Compl."), No. 20-cv-00328-BAH (D.D.C. Feb. 6, 2020), ECF No. 1; (4) two
chemical and polymer companies, Am. Compl. ¶ 13, *Dow Chem. Co. v. Union Pac. R.R. Co.*
("Dow Chem. Compl."), No. 19-cv-03516-BAH (D.D.C. Dec. 9, 2019), ECF No. 10; Am.
Compl. ¶ 13, *Union Carbide Corp. v. Union Pac. R.R. Co.* ("Union Carbide Compl."), No. 19-
cv-03517-BAH (D.D.C. Dec. 9, 2019), ECF No. 10; (5) three shipping companies, Compl.
¶¶ 23–24, *Kawasaki Kisen Kaisha, Ltd. v. BNSF Ry. Co.* ("Kawasaki Compl."), No. 20-cv-
00447-BAH (D.D.C. Feb. 14, 2020), ECF No. 1; Compl. ¶¶ 24–25, *Yang Ming Marine Transp.
Corp. v. BNSF Ry. Co.* ("Yang Ming Compl."), No. 20-cv-00559-BAH (D.D.C. Feb. 25, 2020),
ECF No. 1; Compl. ¶¶ 15–16, *Nippon Yusen Kabushiki Kaisha v. BNSF Ry. Co.* ("NYK
Compl."), No. 20-cv-00790-BAH (D.D.C. Mar. 10, 2020), ECF No. 1; and (6) another producer
of manufactured goods, Am. Compl. ¶ 26, *Anheuser-Busch, LLC v. BNSF Ry. Co.* ("Anheuser-
Busch Compl."), No. 20-cv-00523-BAH (D.D.C. June 11, 2020), ECF No. 35.  Each of these

plaintiffs is a direct purchaser of unregulated rail freight services.  "Unregulated," in this context,

"refers to rail freight transportation services where the rates are set by private contracts or

through other means exempt from rate regulation under federal law."  Yang Ming Compl. ¶ 3.  In

this unregulated market, plaintiffs sought to negotiate competitive freight rates for the transport

of their goods with defendants and other railroads, and ultimately entered contracts for the

purchase of unregulated rail freight services with one or more defendants.  *See, e.g.*, AM Compl.

¶¶ 14–16; NYK Compl. ¶¶ 15–16; Kawasaki Compl. ¶¶ 23–24; Yang Ming Compl. ¶¶ 24–25;

Anheuser-Busch Compl. ¶ 26.[2]

Defendants CSX Transportation, Inc. ("CSX"), Norfolk Southern Railway Company

("Norfolk Southern"), BNSF Railway Company ("BNSF"), and Union Pacific Railroad

Company ("Union Pacific") are, as already noted, the four largest freight railroads in the United

States and together account for more than ninety percent of all railroad traffic in the United

States.  Int'l Paper Compl. ¶ 34.  CSX and Norfolk Southern operate primarily in the eastern

United States and Canada, *id.* ¶¶ 19–20, while BNSF and Union Pacific are concentrated in the

western United States, *id.* ¶¶ 21–22.  All four railroads connect with partners in other markets to

facilitate freight throughout the country.  *See id.* ¶¶ 19–22.  CSX, Norfolk Southern, BNSF, and

Union Pacific are four of seven Class I railroads, which are defined as large freight railway

companies with annual carrier operating revenues in excess of $463.8 million in 2017 dollars.

*Id.* ¶¶ 1, 23 n.1 (citing STB Ex Parte No. EP 748, ID No. 46493, at 2 (June 14, 2018)).

---

[2]     Eight of the ten complaints at issue here name all four major railroad companies as defendants.  The two
exceptions are (1) ArcelorMittal's complaint, which names CSX and Norfolk Southern as defendants, AM Compl.
¶¶ 18–19, with BNSF and Union Pacific named only as non-party co-conspirators, *id.* ¶¶ 20–21; and (2) Nippon
Yusen Kabushiki Kaisha ("NYK")'s complaint, which names only BNSF and Union Pacific as defendants, NYK
Compl. ¶¶ 18–19.  NYK filed a separate complaint against CSX and Norfolk Southern, *see* Compl., *Nippon Yusen
Kabushiki Kaisha v. Norfolk S. Ry. Co.*, No. 20-cv-00858 (D.D.C. Mar. 31, 2020), ECF No. 1, which is not targeted
in defendants' motions to dismiss.

Defendants' instant challenge to ten complaints filed in *MDL II* as time-barred substantially relies on the procedural history and claims alleged in *MDL I* and thus a brief overview of *MDL I*, and its connections to *MDL II*, is helpful, followed by review of the novel factual allegations targeted for dismissal or striking in defendants' pending motions, pursuant to Rules 12(b)(6) and 12(f) of the Federal Rules of Civil Procedure.

### A.     MDL I

The first complaint in what would become *MDL I* was filed on May 14, 2007.  *See* Compl., *Dust Pro, Inc. v. CSX Transp., Inc.*, No. 2:07-cv-2251-DMC (D.N.J. May 14, 2007), ECF No. 1.  Soon after, in November 2007, the Multidistrict Litigation Panel consolidated eighteen separate class actions, then pending in six districts, that alleged common antitrust violations against defendants for pretrial proceedings in this District.  *See* Transfer Order, *MDL I*, No. 07-mc-00489-PLF-GMH, MDL No. 1869 (D.D.C. Nov. 14, 2007), ECF No. 1.

The putative class plaintiffs filed an initial consolidated class complaint in April 2008. Consolidated Am. Class Action Compl., *MDL I*, No. 07-mc-00489-PLF-GMH, MDL No. 1869 (D.D.C. Apr. 15, 2008), ECF No. 91-2.  Defendants unsuccessfully sought to dismiss this complaint as inadequately pled.  *In re Rail Freight Fuel Surcharge Antitrust Litig.* ("*MDL I–D.D.C. 2008 Op.*"), 587 F. Supp. 2d 27, 37 (D.D.C. 2008).  Even at this early stage in the litigation, the district court found "ample support for a plausible inference of an agreement made illegal by Section 1 of the Sherman Act," *id.* at 33, backed by "robust factual details," *id.* at 34, "to make plausible [plaintiffs'] theory that defendants' behavior was collusive and anticompetitive," *id.* at 36.  Those same facts were alleged in the eventual operative complaint in *MDL I.  See In re Rail Freight Fuel Surcharge Antitrust Litig.* ("*MDL I–D.D.C. 2017 Op.*"), 292 F. Supp. 3d 14, 34 (D.D.C. 2017).

The putative class plaintiffs filed the operative class complaint in *MDL I* in February 2010.  Second Consolidated Am. Class Action Compl. ("Class Compl."), *MDL I*, No. 07-mc-00489-PLF-GMH, MDL No. 1869 (D.D.C. Feb. 3, 2010), ECF No. 324.  The Class Complaint alleges that in early 2003, defendants "conspired to increase their total revenues through the use of standardized, uniform, and supra-competitive fuel surcharges."  *MDL I–D.D.C. 2012 Op.*, 287 F.R.D. at 13 (first citing Class Compl. ¶ 1; and then citing *MDL I–D.D.C. 2008 Op.*, 587 F. Supp. 2d at 29).  In the wake of the deregulation of the railroad industry, most rail shipments move under unregulated private transportation contracts.  *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 593 F. Supp. 2d 29, 34 (D.D.C. 2008).  According to the putative class plaintiffs, in this unregulated market, defendants determined that the most effective mechanism to "increase prices across-the-board was through the mechanism of a uniform surcharge applied to as many customers as possible," rather than through efforts to renegotiate each individual contract or to fix each base rate separately.  Class Compl. ¶ 3.  Thus, they "conspired in 2003 to use an artificially high surcharge, purportedly to cover fuel costs, as the means to raise rates across the board, and thereby increase profits."  *Id.* ¶ 4.

The impediment to this plan, the putative class alleged, was that "the great majority of rail freight transportation agreements included rate escalation provisions that weighted a variety of cost factors, including fuel, based on an index called the All Inclusive Index."  *Id.*  The All Inclusive Index ("AII") is published by the Association of American Railroads ("AAR"), a railroad trade organization dominated by defendants.  *Id.* ¶¶ 4, 8.  Plaintiffs alleged that the AII (and a related cost index called the Rail Cost Adjustment Factor ("RCAF")) already accounted for variations in fuel costs.  *Id.* ¶¶ 4, 55.  Thus, any actual increase in fuel costs for the railroads, regardless of size, would be reflected in the increases to base rates calculated under the AII or

RCAF. *Id.* ¶ 55. The putative class alleged that defendants conspired to remove fuel as a cost factor by causing the AAR to replace the AII with an unprecedented, new All Inclusive Index Less Fuel ("AIILF"), a cost-escalation index without fuel as a component. *Id.* ¶ 66. The adoption of the AIILF meant that defendants could now apply a separate "fuel surcharge" as a percentage of the total cost of freight transportation. *Id.* ¶ 5. With fuel costs left out of the AIILF, and therefore no longer weighted against other cost factors, defendants were free to raise total freight prices on a near-universal basis by a given percentage through fuel surcharges. *Id.* ¶ 56. Beginning in July 2003, all four railroads proceeded to implement fuel surcharges in lockstep with one another and therefore to raise revenues across the broad. *Id.* ¶¶ 1, 4, 8–11, 69–73, 80–82. As a result, defendants allegedly earned supra-competitive profits during the class period. *Id.* ¶¶ 1, 99. These actions, according to the putative class, violated Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15. *Id.* ¶¶ 102–07.

The Class Complaint filed in February 2010 proposed a class consisting of:

> All direct purchasers of rail freight transportation services from Defendants, through use of private railroad-shipper contracts or through other means exempt from rate regulation under federal law, as to which Defendants assessed a Rail Fuel Surcharge, at any time from July 1, 2003 until at least June 30, 2007 (the "Class Period").

*Id.* ¶ 38. The Class Complaint defined a "rail fuel surcharge" as "a separately-identified fee that is charged by the railroads for the agreed-upon transportation, purportedly to compensate for increases in the cost of fuel," *id.* ¶ 2, but only made specific allegations concerning fuel surcharges "applied as a percentage against the total cost of the freight transportation," *id.* ¶ 5.

A month later, in March 2010, the putative class moved for certification of a class including:

> All entities or persons that at any time from July 1, 2003 until December 31, 2008 (the "Class Period") purchased rate-unregulated rail freight transportation services directly from one or more of the Defendants, as to which

> Defendants assessed a standalone rail freight fuel surcharge applied as a percentage of the base rate for the freight transport (or where some or all of the fuel surcharge was included in the base rate through a method referred to as "rebasing").

Pls.' Mot. Class Certification ("Class Certification Mot.") at 1, *MDL I*, No. 07-mc-00489-PLF-GMH, MDL No. 1869 (D.D.C. Mar. 30, 2010), ECF No. 339.  This proposed class was subsequently certified.  *MDL I–D.D.C. 2012 Op.*, 287 F.R.D. at 10, 74.  In finding that the requirements for class certification under Federal Rule of Civil Procedure 23 were met, the district court's analysis focused largely on the only major dispute between the parties: whether plaintiffs met their burden to show that "questions of law or fact common to class members predominate over any questions affecting only individual members."  *Id.* at 17 (quoting FED. R. CIV. P. 23(b)(3)).  Of particular concern was whether the putative class's expert analysis demonstrated "that impact can be established at trial with evidence common to the class."  *Id.* at 25.  The court "credit[ed] [the expert's] conclusion that impact and damages [were] capable of proof at trial with common evidence."  *Id.* at 28.

On appeal, the U.S. Court of Appeals for the District of Columbia Circuit vacated the class certification.  *In re Rail Freight Fuel Surcharge Antitrust Litig.—MDL No. 1869* ("*MDL I–D.C. Cir. 2013 Op.*"), 725 F.3d 244, 255 (D.C. Cir. 2013).  The panel chose to exercise jurisdiction over defendants' interlocutory appeal largely because of the Supreme Court's intervening decision in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).  *See MDL I–D.C. Cir. 2013 Op.*, 725 F.3d at 251–53.  *Behrend* clarified the contours of Rule 23's predominance requirement and made clear that, to satisfy that class prerequisite in an antitrust class action, plaintiffs must provide evidence of class-wide damages that are directly attributable to their theory of antitrust impact.  569 U.S. at 35.  District courts must consequently closely examine plaintiffs' evidence of common impact before granting certification, even when doing so

"requires inquiry into the merits of the claim."  *Id.*  The D.C. Circuit panel read *Behrend* to indicate that, in an antitrust class action, common questions "cannot predominate where there exists no reliable means of proving classwide injury in fact."  *MDL I–D.C. Cir. 2013 Op.*, 725 F.3d at 253.  The panel's analysis again focused narrowly on the damages model put forth by the class's expert and concluded that the district court had failed to "grapple[] with" a small set of false positives for legacy shippers and overcharges for class members in the model.  *Id.* at 255; *see also id.* at 253–54.  The panel held that, without a finding by the district court regarding the "soundness" of the statistical model, the model could not satisfy Rule 23's predominance requirement.  *Id.* at 255.  The case was remanded for the district court to take a "hard look" at the damages model in light of *Behrend*.  *Id.*

On remand, the district court denied class certification in October 2017.  *MDL I–D.D.C. 2017 Op.*, 292 F. Supp. 3d at 15.  While observing that the putative class had submitted "strong evidence of conspiracy and class-wide injury" in support of its claims, *id.* at 32, the court, as instructed by the Circuit, "conduct[ed] a rigorous analysis" of the issues "regarding legacy shippers" and overcharges in light of *Behrend*'s clarification of the Rule 23(b) predominance requirement, *id.* at 39.  Despite finding, again, that the putative class satisfied nearly all of Rule 23's requirements, the court was unable to conclude that the "damages model [was] a reliable means of assessing class-wide damages," a shortcoming "fatal to plaintiffs' claim of predominance."  *Id.* at 144.  The conclusion that "individual issues predominate regarding injury and damages," *id.*, also meant that plaintiffs failed to meet Rule 23(b)'s superiority requirement because they could not show that a class action was the "superior" method of adjudication, *id.* at 145.  Class certification was therefore denied.  *Id.*  The D.C. Circuit affirmed this ruling on August 16, 2019.  *MDL I–D.C. Cir. 2019 Op.*, 934 F.3d at 627.

**B.     MDL II**

Once class certification in *MDL I* was denied, some absent putative former class members began filing individual actions in district courts across the country to pursue the conspiracy claim advanced by the putative class against defendants.  *See, e.g.*, Compl., *Kellogg Co. v. BNSF Ry. Co.*, No. 19-cv-02969-BAH (D.D.C. Oct. 2, 2019), ECF No. 1; Compl., *Coffeyville Res. Nitrogen Fertilizers, LLC v. BNSF Ry. Co.*, No. 4:19-cv-03762 (S.D. Tex. Sept. 30, 2019), ECF No. 1.  On February 6, 2020, the Multidistrict Litigation Panel consolidated twenty-six such cases for pretrial proceedings in this Court in *MDL II*.  Transfer Order, ECF No. 1.  Since then, an additional sixty-six cases initiated by former putative class members have been consolidated into the multidistrict litigation pending before this Court, for a total of ninety-two cases in *MDL II*.[3]

Generally, each of the *MDL II* plaintiffs allege the same conspiracy described by the putative class in *MDL I*, namely: that in early 2003, the four defendants CSX, Norfolk Southern, BNSF, and Union Pacific conspired to increase their profits by artificially raising the price of rail freight services on unregulated rail freight transport traffic in the United States.  *Compare* Class Compl. ¶¶ 3–4, *with* AM Compl. ¶ 2.[4]  Defendants implemented this plan by challenging the AII, a cost-escalation index that weighted a variety of cost factors, including fuel, that was published by the AAR, a railroad industry trade association on whose board the CEO of each defendant sat at all relevant time.  *See* AM Compl. ¶ 49 n.3; Int'l Paper Compl. ¶ 5.  This index was widely used to calculate rate increases for the majority of unregulated, private rail freight transportation

---

[3]      Except for the ten complaints now at issue, defendants have answered or soon will answer the remaining eighty-two complaints.  Defs.' Consol. Reply Supp. Mot. Dismiss Compl. Pls. ArcelorMittal, Gerdau Steel, Int'l Paper, & GenOn ("Defs.' Consol. Reply") at 3, ECF No. 119.
[4]      All ten complaints make substantially similar allegations regarding the 2003–2008 conspiracy to implement rate-based fuel surcharges described by the putative class in *MDL I*.  For simplicity, the Court cites only to the complaint filed in *ArcelorMittal USA LLC v. CSX Transportation, Inc.  See* AM Compl.

agreements.  *Compare* Class Compl. ¶¶ 4, 8, 55, *with* AM Compl. ¶¶ 5–6.  Since the AII already accounted for changes in fuel costs in its price-adjustment mechanism, the use of this index posed a barrier to defendants implementing standalone fuel surcharges, which could raise revenues.  *Compare* Class Compl. ¶¶ 4, 8, 55, *with* AM Compl. ¶¶ 5–6.  To eliminate this obstacle, defendants allegedly conspired to cause the AAR to abandon the AII in favor of the AIILF, a new cost-escalation index that excluded fuel as a cost factor.  *Compare* Class Compl. ¶¶ 66–68, *with* AM Compl. ¶¶ 49–50.  They achieved this goal through a series of in-person meetings at conferences, restaurants and recreational events and through AAR board meetings. *Compare* Class Compl. ¶ 58, *with* AM Compl. ¶ 42.  *MDL II* plaintiffs, like the putative class, allege that defendants then implemented standalone, artificially high fuel surcharges assessed as a percentage of the total cost of freight transportation, and raised the surcharges in lockstep for some years, with the result of raising overall rail freight rates.  *Compare* Class Compl. ¶¶ 1, 4–13, 80–82, 104, *with* AM Compl. ¶¶ 1, 3, 12, 52, 54–56.  The alleged conspiracy was a great success and generated substantial supra-competitive profits for defendants.  *Compare* Class Compl. ¶¶ 1, 99, *with* AM Compl. ¶¶ 86–89.

Echoing the proposed class, as defined in the putative class plaintiffs' Motion for Class Certification, most of the underlying complaints in *MDL II* allege that this conspiracy took place from July 1, 2003 to December 31, 2008.  *See, e.g.*, Am. Compl. ¶ 122, *Sterling Steel Co. LLC v. Union Pac. R.R. Co.*, No. 08-cv-00539-PLF (D.D.C. Feb. 13, 2020), ECF No. 8.  Also like the putative class, the *MDL II* plaintiffs assert a single count for damages against defendants for price fixing, in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.  *See, e.g.*, AM Compl. ¶¶ 99–106.

The ten complaints subject to defendants' pending motions to dismiss or strike were filed between November 2019 and March 2020.  *See generally* AM Compl.; Compl., *Dow Chem. Co. v. Union Pac. R.R. Co.*, No. 19-cv-03516-BAH (D.D.C. Nov. 21, 2019), ECF No. 1; Compl., *Union Carbide Corp. v. Union Pac. R.R. Co.*, No. 19-cv-03517-BAH (D.D.C. Nov. 21, 2019), ECF No. 1; Gerdau Compl.; Int'l Paper Compl.; GenOn Compl; Kawasaki Compl.; Compl., *Anheuser-Busch, LLC*, No. 20-cv-00523-BAH (D.D.C. Feb. 1, 2020), ECF No. 1; Yang Ming Compl.; NYK Compl.  All were transferred to this Court and added to *MDL II* for consolidated pretrial proceedings.

Defendants filed five of their motions to dismiss in the appropriate individual actions before the consolidated pretrial proceedings of *MDL II* began.  *See* Defs.' Mot. Dismiss, *ArcelorMittal USA LLC v. CSX Transp., Inc.*, No. 19-cv-3379-BAH (D.D.C. Feb. 6, 2020), ECF No. 24; Defs.' Mot. Dismiss, *Dow Chem. Co. v. Union Pac. R.R. Co.*, No. 19-cv-03516-BAH (D.D.C. Feb. 7, 2020), ECF No. 19; Defs.' Mot. Dismiss, *Union Carbide Corp. v. Union Pac. R.R. Co.*, No. 19-cv-03517-BAH (D.D.C. Feb. 7, 2020), ECF No. 22; Defs.' Mot. Dismiss, *Gerdau Ameristeel Corp. v. Union Pac. R.R. Co.*, No. 19-cv-03618-BAH (D.D.C. Feb. 7, 2020), ECF No. 22; Defs.' Mot. Dismiss, *Int'l Paper Co. v. Union Pac. R.R. Co.*, No. 20-cv-00023-BAH (D.D.C. Feb. 7, 2020), ECF No. 12.  Those motions were terminated by this Court's Initial Practice and Procedure Order ¶ 4, ECF No. 10, and subsequently were refiled by defendants on the *MDL II* docket pursuant to this Court's Scheduling Order of May 22, 2020, ECF No. 102.  *See* Defs.' AM Mot.; Defs.' Gerdau Mot.; Defs.' Int'l Paper Mot.; Defs.' Dow Mot.; Defs.' Union Carbide Mot.  The remaining four motions were filed for the first time in this MDL, *see* Defs.' GenOn Mot.; Defs.' NYK Mot.; Defs.' Kawasaki & Yang Ming Mot.; Defs.' Anheuser-Busch Mot., with briefing completed on all the pending motions to dismiss on July 28, 2020, *see*

Defs.' Reply Supp. Defs.' Mot. Partial Dismissal Pls.' Am. Compl. ("Defs.' Anheuser-Busch

Reply"), ECF No. 318.

### C.      Challenged Differences in Ten Complaints at Issue

The ten complaints subject to defendants' motions to dismiss or strike, like the eighty-

two complaints that defendants have already answered or intend to answer, include the same core

allegations reflected in the Class Complaint, but supplemented with certain new factual

allegations not raised by the putative class.  These differences are described below.

> **1.   *Six Complaints of Omnibus Plaintiffs: ArcelorMittal, Gerdau Ameristeel
> Corp., GenOn Energy Management, LLC, International Paper Co., Dow
> Chemical Co., and Union Carbide Co.***

Six plaintiffs ArcelorMittal, Gerdau Ameristeel Corp., GenOn Energy Management,

LLC, International Paper Co., Dow Chemical Co., and Union Carbide Co., with their

subsidiaries, (together, "omnibus plaintiffs") brought individual actions, between November

2019 and February 2020, making materially similar allegations against defendants.  *See

generally* AM Compl.; Compl., *Dow Chem. Co.*, No. 19-cv-03516-BAH; Compl., *Union

Carbide Corp.*, No. 19-cv-03517-BAH; Gerdau Compl.; Int'l Paper Compl.; GenOn Compl.

Defendants move to dismiss all six complaints in their entirety under Rule 12(b)(6), for failure to

state a claim, or, in the alternative, to strike under Rule 12(f).  *See* Defs.' AM Mot.; Defs.'

Gerdau Mot.; Defs.' GenOn Mot.; Defs.' Int'l Paper Mot.; Defs.' Union Carbide Mot.; Defs.'

Dow Mot.[5]

---

[5]      These six plaintiffs and the defendants stipulated to omnibus briefing of the six motions to dismiss, with
these plaintiffs filing a single omnibus opposition to all six motions to dismiss, *see* Pls.' Mem. Law Supp. Omnibus
Opp'n Defs.' Mots. Dismiss ("Pls.' Omnibus Opp'n") at 3 n.4, ECF No. 115, and defendants filing a consolidated
reply in support of four of their motions to dismiss, *see* Defs.' Consol. Reply, which was incorporated by reference
in support of the two remaining motions to dismiss, *see* Defs.' Reply Mem. Law Supp. Defs.' Mot. Dismiss Dow's
Am. Compl. at 1, ECF No. 120; Defs.' Reply Mem. Law Supp. Defs.' Mot. Dismiss Union Carbide's Am. Compl. at
1, ECF No. 121. Thus, defendants' motions to dismiss omnibus plaintiffs' complaints will be analyzed together,
generally citing, as these parties did, to the complaint and motion to dismiss filed in *ArcelorMittal USA LLC v. CSX
Transportation, Inc.*

Omnibus plaintiffs' allegations differ from those of the putative class in three respects. First, omnibus plaintiffs name two Canadian railroads, Canadian National Railway ("CN") and Canadian Pacific Railway ("CP") (whose U.S. subsidiaries are Class I railroads), *see, e.g.*, AM Compl. ¶¶ 1, 22 & n.2, and a fifth Class I railroad, Kansas City Southern Railway ("KCS"), *see, e.g.*, Int'l Paper Compl. ¶¶ 3, 23, as non-party co-conspirators. Specifically, they allege that "[o]ther unnamed major Class I railroads . . . including, but not limited to, KCS, CN, and CP, or their predecessors" "conspired with [d]efendants to artificially raise rail freight prices and generate cartel profits." *Id.* ¶ 23 (footnotes omitted); *see also, e.g.*, AM Compl. ¶ 22. To support this theory, omnibus plaintiffs allege that "KCS, CN, and CP were also AAR members when the conspiracy began and implemented Inflated Fuel Surcharges in accordance with the anticompetitive agreement" between defendants, Int'l Paper Compl. ¶ 23 n.2; AM Compl. ¶ 22 n.2, and that the CEOs of CN and CP were, along with defendants' CEOs, members of the AAR board at all relevant times, Int'l Paper Compl. ¶ 5; AM Compl. ¶ 49 n.3. The alleged co-conspirators, in lockstep with defendants, imposed and increased supra-competitive standalone fuel surcharges after transitioning from the AII to the new AIILF cost-escalation index. AM Compl. ¶ 61. In contrast, the Class Complaint makes no mention of CN, CP, or KCS.[6]

Second, the omnibus plaintiffs allege a further conspiracy between defendants to fix mileage-based fuel surcharges in addition to the rate-based fuel surcharges alleged similarly to the putative class. *See, e.g.*, AM Compl. ¶¶ 12, 57. This theory claims that, after the Surface Transportation Board ("STB"), the federal agency with authority over rate-regulated freight

---

[6]     KCS was named as a defendant by some of the individual named plaintiffs in *MDL I* before consolidation. *See, e.g.*, Compl. ¶ 14, *Dust Pro, Inc.*, No. 2:07-cv-2251-DMC. The class dropped KCS as a defendant in its first consolidated class complaint, *see* Consolidated Am. Class Action Compl., *MDL I*, No. 07-mc-00489-PLF-GMH, MDL No. 1869 (D.D.C. Apr. 15, 2008), ECF No. 91-2, and KCS was consequently terminated from the litigation on April 15, 2008, *see* Docket, *MDL I*, No. 07-mc-00489-PLF-GMH, MDL No. 1869.

traffic, determined in a 2007 decision that defendants' practice of imposing rate-based fuel surcharges for regulated rail freight traffic was an "'unreasonable practice,'" *id.* ¶ 72 (quoting STB Ex Parte No. 661, ID No. 37341, at 1 (Jan. 25, 2007)), defendants gradually abandoned the rate-based fuel surcharge in favor of an artificially high mileage-based fuel surcharge, *see id.* ¶¶ 93–95.  Union Pacific was allegedly the first defendant to move towards a mileage-based fuel surcharge, in 2007, *id.* ¶ 89, followed by CSX, *id.* ¶ 94, and BNSF, which implemented a mileage-based fuel surcharge for at least some of the period from 2008–2013, *id.* ¶ 95, and finally Norfolk Southern, in 2013, *id.* ¶ 93.  This allegation of a price-fixing conspiracy for a second fixed fuel surcharge that superseded the rate-based fuel surcharge at the heart of the original conspiracy, appears nowhere in the Class Complaint.

Finally, omnibus plaintiffs expand the duration of the alleged conspiracy and its effects beyond the period alleged in the Class Complaint, "until at least December 31, 2008 and through the present," *id.* ¶ 106, with omnibus plaintiffs overpaying for rail freight services "since July 1, 2003," Int'l Paper Compl. ¶ 96; Union Carbide Compl. ¶ 92; Dow Chem. Compl. ¶ 93; Gerdau Compl. ¶ 92; GenOn Compl. ¶ 93.  To support this extended conspiracy lasting through the past decade, omnibus plaintiffs claim that defendants "took steps," including the adoption of mileage-based fuel surcharges, that "differentiated" their post-2007 conduct from their pre-2007 actions, "but did not constitute a withdrawal from the cartel."  AM Compl. ¶ 93; *see also, e.g.*, Gerdau Compl. ¶ 83 (noting that defendants "all implemented mileage-based fuel surcharge programs" but "this did not mean [they] had withdrawn from the cartel").  Specifically, they allege that defendants continued "to apply . . . mileage-based fuel surcharges on top of base rates that were adjusted according to the AIILF" with "the same revenue-generating aim" behind the now-extinct rate-based fuel surcharge program.  AM Compl. ¶ 94.  According to omnibus plaintiffs,

"[t]he ultimate objective of [d]efendants' conspiracy, to raise total rail freight rates, continued to motivate [d]efendants' behavior." *Id.* ¶ 98; *see also, e.g.*, Int'l Paper Compl. ¶ 88.  Indeed, omnibus plaintiffs allege that defendants "continued to communicate and collude regarding rail freight services and rates after 2007," citing that they have "remained members of the AAR, and they have continued to attend conferences and industry gatherings," all of which allegedly constitute "collusive activity" with "the continuing effect of restraining trade in the market for rail freight services."  AM Compl. ¶ 98.  As a result, omnibus plaintiffs "continue to this day to pay inflated rates for rail freight services as a consequence of [d]efendants' past and ongoing coordination of prices."  *Id.* ¶ 96; *see also, e.g.*, Int'l Paper Compl. ¶ 96 ("As a proximate result of [d]efendants' unlawful conduct, [International Paper] has suffered injury in that it has paid inflated prices for unregulated rail freight services since July 1, 2003.").  While, under omnibus plaintiffs' theory, the alleged conspiracy and its effects continue to the present, by contrast, the putative class first delineated a class period set to end on June 30, 2007, Class Compl. ¶ 1, and later moved to certify a class with an end date of December 31, 2008, Class Certification Mot. at 1.

### 2.  *Anheuser-Busch, LLC Complaint*

Plaintiffs Anheuser-Busch, LLC and Anheuser-Busch Companies, LLC (together, "Anheuser-Busch plaintiffs") filed their individual complaint on February 1, 2020, *see* Compl., *Anheuser-Busch, LLC*, No. 20-cv-00523-BAH, and an amended complaint on June 11, 2020, *see* Anheuser-Busch Compl.  Defendants seek partial dismissal of the amended complaint for failure to state a claim under Rule 12(b)(6), or in the alternative, to partially strike under Rule 12(f).  *See* Defs.' Anheuser-Busch Mot. at 1.  This motion is restricted to Anheuser-Busch plaintiffs' "allegations that [d]efendants engaged in a conspiracy concerning fuel surcharges other than

those that were assessed as a percentage of the base freight rate."  Defs.' Mem. Supp. Defs.'

Mot. Partial Dismissal Pls.' Am. Compl. ("Defs.' Anheuser-Busch Mem.") at 1, ECF No. 257-1.

The Anheuser-Busch plaintiffs allege a single cause of action under Sections 1 and 3 of

the Sherman Act, 15 U.S.C. §§ 1, 3.  Anheuser-Busch Compl. ¶¶ 1, 87.  Like the putative class,

they primarily contend that defendants engaged in a conspiracy to increase overall rail freight

rates by causing the AAR to abandon the AII in favor of the AIILF and then imposing supra-

competitive, standalone rate-based fuel surcharges (that is, surcharges assessed "as a percentage

multiplier of the total base rate for the rail freight transportation," *id.* ¶ 11 (emphasis omitted)).

*See id.* at ¶¶ 2–12.  Anheuser-Busch plaintiffs diverge from the putative class's allegations in a

single paragraph of their amended complaint that is the target of defendants' motion for partial

dismissal.  That paragraph alleges that "Anheuser-Busch paid supra-competitive prices on rail

freight transportation services even when the railroads did not charge a rail fuel surcharge based

on a percentage of the base rate" because "the railroads used the conspiracy . . . to adjust the

components of freight pricing through other types of fuel surcharges."  *Id.* ¶ 27.  Defendants

challenge this single-line reference to "other surcharges" as intended to expand Anheuser-Busch

plaintiffs' price-fixing conspiracy claim to cover non-rate-based fuel surcharges, in particular,

the mileage-based fuel surcharge payments contested in omnibus plaintiffs' pleadings.  In

defendants' view, such an expanded claim would be time-barred.  Defs.' Anheuser-Busch Mem.

at 2–3.

### 3.   *Nippon Yusen Kabushiki Kaisha Complaint*

Plaintiffs Nippon Yusen Kabushiki Kaisha and NYK Line (North America), Inc.

(together, "NYK plaintiffs") filed their individual complaint on March 10, 2020.  *See* NYK

Compl.  Defendants seek to dismiss this complaint entirely for failure to state a claim under Rule

12(b)(6) or, in the alternative, to strike under Rule 12(f).  *See* Defs.' NYK Mot. at 1.  Like the

Class Complaint, the NYK Complaint includes allegations of the defendants' alleged 2003–2008 agreement to increase overall rail freight prices by causing the AAR to adopt the AIILF and then implementing uniform, inflated rate-based fuel surcharges.  *Compare* Class Compl. ¶¶ 2–15, *with* NYK Compl. ¶¶ 53–66.[7]

Unlike the putative class, however, NYK plaintiffs also allege a conspiracy among defendants that began in 2000, *id.* ¶ 1, and ended in 2013, *id.* ¶¶ 95–96, both three years earlier and five years later than the period alleged by the putative class.  Under their theory, the conspiracy alleged by the putative class was only one in a series of steps taken by defendants to increase rail freight prices, which began in 2000 with coordination to fix rate-based fuel surcharges while the fuel-inclusive cost-escalation indices were in effect, *id.* ¶¶ 36–43, and in fact resulted in a revised, inflated fuel surcharge program, *id.* ¶¶ 44–52.  After defendants realized the impediment presented by the AII and RCAF, NYK plaintiffs allege, the conspiracy evolved in 2003 into a concerted effort to cause the AAR to adopt the AIILF to facilitate the widespread use of rate-based fuel surcharges, *id.* ¶¶ 55–68, which is the conspiracy alleged by the putative class.  NYK plaintiffs further allege that they experienced continuing harm from defendants' conspiracy after 2008, because they "continued to pay supracompetitive [fuel surcharges] to [d]efendants for several years after the conspiracy ended, pursuant to the multi-year contracts NYK had entered or renegotiated with [d]efendants prior to the end of the conspiracy," *id.* ¶ 95, as well as the contract they entered with defendants "in 2009," which

---

[7]     Defendants allege that NYK plaintiffs, as "intermodal shippers," were subject to "different" fuel surcharge programs than those at issue in *MDL I* and alleged in NYK plaintiffs' complaint. Defs.' Mem. Supp. Mot. Dismiss Pls.' Compl. or Mot. Strike ("Defs.' NYK Mem.") at 3, ECF No. 196-1.  Nevertheless, defendants have not moved to dismiss NYK plaintiffs' allegations on the ground that, as intermodal shippers, they were not part of the putative class in *MDL I*.  In any event, NYK plaintiffs' allegations that they paid inflated rate-based fuel surcharges "assessed pursuant to [d]efendants' conspiracy," NYK Compl. ¶¶ 93, 95, are accepted as true, "even if doubtful in fact," on a motion to dismiss, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

"extended into 2013 with the same [inflated rate-based fuel surcharge] formula which applied in the contracts during 2000 to 2008," *id.* ¶ 96.

### 4. *Kawasaki Kisen Kaisha, Ltd. & Yang Mine Marine Transport Corp. Complaints*

Plaintiffs Kawasaki Kisen Kaisha, Ltd. and "K" Line America, Inc. (together, "Kawasaki plaintiffs") filed their individual complaint on February 14, 2020, Kawasaki Compl., while plaintiffs Yang Ming Marine Transport Corp. and Yang Ming (America) Corp. (together, "Yang Ming plaintiffs") initiated their suit on February 25, 2020, Yang Ming Compl.  As defendants concede, *see* Defs.' Mem. Supp. Mot. Partial Dismissal or Mot. Strike Compls. Pls. Kawasaki & Yang Ming ("Defs.' Kawasaki & Yang Ming Mem.") at 5, ECF No. 200-1, Kawasaki and Yang Ming plaintiffs largely bring "the same allegations of the plaintiffs in the putative class action," *id.*, and allege the same single cause of action, a conspiracy to fix the price of rail freight transportation in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act, *see* Kawasaki Compl. ¶¶ 2, 18–19, 56–92; Yang Ming Compl. ¶¶ 2, 19–23, 57–93.  The claims in these two complaints differ from those of the putative class in only one respect: while the putative class alleged a class period through "at least June 30, 2007" in their complaint, Class Compl. ¶ 1, and through "December 31, 2008" at the class certification stage, Class Certification Mot. at 1, Kawasaki and Yang Ming plaintiffs allege that the conspiracy "and/or" its effects lasted until September 30, 2012, Kawasaki Compl. ¶ 2, and December 31, 2012, Yang Ming Compl. ¶ 2, respectively.  Defendants' motion for partial dismissal is restricted to Kawasaki and Yang Ming plaintiffs' allegations that "[d]efendants conspired between 2009–2012."  Defs.' Kawasaki & Yang Ming Mem. at 2; *see id.* at 1–2.

## II.   APPLICABLE LEGAL STANDARDS

### A.   Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), "the 'complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Wood v. Moss*, 572 U.S. 744, 757–58 (2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Bowman v. Iddon*, 848 F.3d 1034, 1039 (D.C. Cir. 2017).  A facially plausible claim pleads facts that are not "'merely consistent with' a defendant's liability" but that also "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)); *see also Rudder v. Williams*, 666 F.3d 790, 794 (D.C. Cir. 2012).  In deciding a motion under Rule 12(b)(6), the court must consider the whole complaint, accepting all factual allegations as true, "even if doubtful in fact."  *Twombly*, 550 U.S. at 555.  Courts do not "assume the truth of legal conclusions, nor do [they] 'accept inferences that are unsupported by the facts set out in the complaint.'"  *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (internal citation omitted) (quoting *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007)).

When dismissal is sought on statute-of-limitations grounds, the plaintiff's claims must be "conclusively time-barred on the face of the complaint."  *Capitol Servs. Mgmt., Inc. v. Vesta Corp.*, 933 F.3d 784, 787 (D.C. Cir. 2019); *see also Commonwealth Land Title Ins. Co. v. KCI Techs., Inc.*, 922 F.3d 459, 464 (D.C. Cir. 2019); *accord Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996).

### B.   Federal Rule of Civil Procedure 12(f)

Federal Rule of Civil Procedure 12(f) provides that the court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  FED. R. CIV. P. 12(f).  A district court "has discretion" to grant or deny a motion to strike.  2 JAMES WM.

MOORE ET AL., MOORE'S FEDERAL PRACTICE–CIVIL § 12.37 (2020).  "[S]triking a portion of a

pleading is a drastic remedy" and is "viewed with disfavor."  5C WRIGHT & MILLER, FED. PRAC.

& PROC. § 1380 (3d ed. 2020); *see also Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine*

*Distribs. Pty. Ltd.*, 647 F.2d 200, 201 (D.C. Cir. 1981) (per curiam).  As a result, motions to

strike are typically denied "unless the challenged allegations have no possible relation or logical

connection to the subject matter of the controversy and may cause some form of significant

prejudice to one or more of the parties to the action."  5C WRIGHT & MILLER § 1382 (footnote

omitted).

## III.   DISCUSSION

Defendants challenge as time-barred, in whole or in part, ten complaints filed as part of

*MDL II*.  The Clayton Act specifies that a claim "shall be forever barred unless commenced

within four years after the cause of action accrued."  15 U.S.C. § 15b.  Unless an exception to the

statute of limitations is plausibly pled, a claim for damages under the Clayton Act accrues when

the plaintiff is first injured, such that the statute of limitations begins to run "'when a defendant

commits an act that injures a plaintiff[].'"  *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190–91

(1997) (quoting *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971)).

Plaintiffs in the ten actions subject to the pending dismissal motions allege that they first paid

artificially inflated prices for rail freight services as early as 2000, *see* NYK Compl. ¶ 95, and no

later than July 1, 2003, *see, e.g.*, Dow Chem. Compl. ¶ 1.  For plaintiffs' claims in their entirety

to be timely under the Clayton Act, then, they would have had to be brought by July 1, 2007, at

the latest.  Since all ten suits were filed between November 2019 and March 2020, the timeliness

of these complaints rests on whether plaintiffs have plausibly pled an exception to the running of

the statute of limitations.

The Supreme Court outlined one such exception, applicable to the claims of absent former putative class members such as the plaintiffs here, in *American Pipe*.  The legal principles guiding the tolling of the statute of limitations under *American Pipe* are discussed first, followed by review of certain considerations stemming from the procedural posture of *MDL II*, before turning to examination of the specific factual allegations challenged by defendants in the ten complaints at issue.

A.      **Principles of *American Pipe* Tolling**

The timeliness of the challenged factual allegations turns on whether the exception to the statute of limitations for former putative class members provided in *American Pipe* applies.  The Supreme Court in *American Pipe* held "that the commencement of a class action suspends the applicable statute of limitations" as to all putative class members through the class certification stage.  414 U.S. at 554.  The limitations period is "tolled for all members of the putative class until class certification is denied," at which time class members may choose to bring a separate lawsuit or to file a motion to intervene in the former class action.  *Crown, Cork & Seal Co. v. Parker* ("*Crown*"), 462 U.S. 345, 354 (1983); *see also Barryman-Turner v. District of Columbia*, 115 F. Supp. 3d 126, 134 (D.D.C. 2015) ("The statute of limitations ceases to run for the entire period from the day a class action is filed until the class is decertified or the court declines to certify the class . . . .").

The *American Pipe* rule promotes Rule 23's goals of "efficiency and economy of litigation" by eliminating the need for putative class members to file protective motions to intervene in the pending class action to preserve their claims, *Am. Pipe*, 414 U.S. at 553, and thus preventing a "needless multiplicity of actions," *Crown*, 462 U.S. at 351.  The rule also serves the functions of statutes of limitations, which are "'designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been

22

lost, memories have faded, and witnesses have disappeared.'" *Am. Pipe*, 414 U.S. at 554

(quoting *Order of R.R. Telegraphers v. Ry. Exp. Agency*, 321 U.S. 342, 348–49 (1944)).  These

underlying policies of "essential fairness" and "of barring a plaintiff who has slept on his rights,"

*id.* (internal quotations omitted), are met "when . . . a named plaintiff who is found to be

representative of a class commences a suit and thereby notifies the defendants not only of the

substantive claims being brought against them, but also of the number and generic identities of

the potential plaintiffs who may participate in the judgment," *id.* at 554–55.  In such

circumstances, the defendant timely receives "the essential information necessary to determine

both the subject matter and size of the prospective litigation," *id.* at 555, and faces "no potential

for unfair surprise," *Crown*, 462 U.S. at 353.

To ensure fair notice to defendants, the Supreme Court has cautioned that the *American

Pipe* rule "should not be read . . . as leaving a plaintiff free to raise different or peripheral claims

following denial of class status." *Crown*, 462 U.S. at 354 (Powell, J., concurring).  Rather,

tolling is available only in individual actions concerning "'the same evidence, memories, and

witnesses as the subject matter of the original class suit.'"  *United Airlines, Inc. v. McDonald*,

432 U.S. 385, 393 n.14 (1977) (quoting *Am. Pipe*, 414 U.S. at 562 (Blackmun, J., concurring));

*see also Crown*, 462 U.S. at 353 (noting that a class complaint makes defendant "aware of the

need to preserve evidence and witnesses respecting the claims of all the members of the class").

This tolling limitation ensures that the defendant is placed on notice by the class suit and

experiences no prejudice from the tolling of the statute of limitations.

The D.C. Circuit applies "a broad, functional reading of *American Pipe*," *McCarthy v.

Kleindienst*, 562 F.2d 1269, 1274 (D.C. Cir. 1977), that emphasizes "whether tolling under [the]

circumstances would serve the purposes underlying the class-action tolling doctrine,"

*Menominee Indian Tribe of Wis. v. United States*, 614 F.3d 519, 527 (D.C. Cir. 2010).  Under

this approach, tolling for putative class members is appropriate so long as "the defendant has

received fair notice" through the former class action "of the number and generic identity of the

potential [plaintiffs] and their substantive claims."  *McCarthy*, 562 F.2d at 1274.  In applying this

functional framework, courts should "compar[e] the allegations of the class complaint" with

those of the individual plaintiffs, *id.*, and may also "go beyond the facts of the complaint[s] to

analysis of the specific evidence involved in the [individual] action and to consideration of

possible prejudice to the defendant," *id.* at 1274–75; *see also Smith v. Pennington*, 352 F.3d 884,

893 (4th Cir. 2003) (finding that courts "can consider evidence outside of the complaint that

demonstrates the extent of the class" and the claims it alleged).  Through this exercise, courts

assess whether defendants' "liability" in the former class action and the present individual action

"is predicated on the same acts," such that "there can be no doubt that the defendants have

received sufficient notice of the contours of potential claims."  *McCarthy*, 562 F.2d at 1275.  In

other words, though claims made in a subsequent individual suit need not be identical in every

respect to the those raised in the class action, *American Pipe* tolling does not excuse untimeliness

of factual allegations or liability theories wholly distinct from the original class action.

> **B.      Considerations Guiding Analysis**

Defendants do not contest that, under *American Pipe*, the first-filed individual complaint

in *MDL I* tolled the Clayton Act's statute of limitations, 15 U.S.C. § 15b, for absent putative

class members who, after the denial of class certification, "file[d] lawsuits that assert the same

claims as the former putative class."  Defs.' Mem. Supp. Mot. Dismiss ArcelorMittal's Compl.

("Defs.' AM Mem.") at 9, ECF No. 106-1.[8]  They argue instead that the *American Pipe* rule does not toll the statute of limitations with respect to some of the allegations in the ten complaints at issue because of divergence with the allegations pressed by the putative class, rendering the former time-barred.  *See, e.g.*, *id.* at 9–17.

Put another way, defendants concede that all ten of the targeted complaints contain core allegations subject to *American Pipe* tolling that may appropriately move forward in *MDL II*. *See, e.g.*, Defs.' AM Mem. at 9; Defs.' Consol. Reply at 3–4.  This then presents a puzzle as to how the pending motions further "the just, speedy, and inexpensive determination of" this MDL. FED. R. CIV. P. 1.  As further discussed *infra* Part III.E, even if defendants were correct that certain of plaintiffs' novel allegations in support of their single legal claim are time-barred, the consequence of such untimeliness is only to clarify the scope of available relief, since plaintiffs may not recover damages arising from allegations not tolled by *American Pipe*.  Defendants' pending motions thus may provide some clarity as to the scope of damages plaintiffs may be due should they prevail, but providing such clarity now seems premature.  At the same time, complete or partial dismissal of plaintiffs' legal claim based on a handful of potentially untimely factual allegations, in the context of otherwise sufficient and timely allegations, is inappropriate. Courts deciding a motion to dismiss evaluate "whether *all* the facts alleged, when viewed in the light most favorable to the plaintiffs, render the plaintiff's entitlement to relief plausible." *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 14 (1st Cir. 2011) (emphasis in original) (citing *Twombly*, 550 U.S. at 569 n.14); *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S.

---

[8]       *American Pipe* tolling typically ends when a district court denies class certification, and the statute of limitations therefore runs during the pendency of an appeal of the class certification determination.  *See Menominee Indian Tribe of Wis.*, 614 F.3d at 527.  Here, defendants agreed to exclude from future statutes of limitations calculations for claims previously tolled by the pendency of the class action the time between the district court's 2017 order denying class certification, *MDL I–D.D.C. 2017 Op.*, 292 F. Supp. 3d 14, and the D.C. Circuit's decision affirming that order, *MDL I–D.C. Cir. 2019 Op.*, 934 F.3d 619.  Defs.' AM Mem. at 9 n.3.  The statute of limitations for any claims tolled under *American Pipe* therefore began to run on August 16, 2019.

27, 47, 49 (2011) (noting that in evaluating Rule 12(b)(6) motion, allegations of the complaint must be viewed "as a whole," *id.* at 47, and "taken collectively," *id.* at 49); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007) (stating that "courts must consider the complaint in its entirety . . . when ruling on Rule 12(b)(6) motions to dismiss" and consider "*all* of the facts alleged, taken collectively," not just "any individual allegation, scrutinized in isolation" (emphasis in original)).  The issue on a motion to dismiss is whether plaintiffs have adequately pled a facially plausible *legal* claim, not whether discrete *factual* allegations that support a claim are individually admissible, provable, or otherwise adequate to support the damages claimed.

Given that each of the challenged complaints concededly contains adequate allegations to support timely aspects of the antitrust claim, the pending defense motions simply delay the inevitable.  If granted, the pending motions would have the practical effect of prolonging pretrial proceedings: should the targeted complaints be dismissed or the targeted allegations stricken, as defendants urge, plaintiffs would have the opportunity to file amended complaints or to re-file their complaints with the stricken allegations eliminated.  The result would be to simply delay defendants' answers or prompt yet another round of motions to dismiss or strike portions of the amended complaints.

In addition to inviting delay, the pending defense motions to dismiss or strike may be designed as an effort to limit the scope of discovery in the early days of *MDL II*.  Yet the standard for striking parts of pleadings purposely sets a high bar so that pretrial motions to strike are not used as a delay tactic or to cut off discovery prematurely.  As a caution to parties not to engage in "'dilatory tactic[s]'" during pretrial proceedings, *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001) (quoting 5A WRIGHT & MILLER § 1380 (2d ed.

1990)), "'many courts will grant [a Rule 12(f)] motion only if the portions sought to be stricken as immaterial are also prejudicial or scandalous,'" *Uzlyan v. Solis*, 706 F. Supp. 2d 44, 52 (D.D.C. 2010) (quoting *Makuch v. FBI*, Civ. No. 99-1094, 2000 WL 915767, at *2 (D.D.C. Jan. 6, 2000)); *see also Nugent v. Unum Life Ins. Co. of Am.*, 752 F. Supp. 2d 46, 51 (D.D.C. 2010) (noting that striking parts of pleading under Rule 12(f) is a "drastic" and "disfavored" remedy); *Logan v. Jones Lang Lasalle Ams., Inc.*, Case No. 18-cv-02278 (APM), 2019 WL 1960208, at *4 (D.D.C. May 2, 2019) (denying motion to strike because merely "question[ing] the legal relevancy of the facts" does "not rise to the level of 'redundant, immaterial, impertinent, or scandalous' matter that would warrant striking them from the pleading"). "'[A]bsent a strong reason for so doing,' courts will generally 'not tamper with pleadings.'" *Bey v. Wash. Metro. Area Transit Auth.*, 341 F. Supp. 3d 1, 11 (D.D.C. 2018) (quoting *Nwachukwu v. Rooney*, 362 F. Supp. 2d 183, 190 (D.D.C. 2005)).

Despite the extensive briefing on the pending motions, defendants make little effort to explain how any of plaintiffs' allegations meet Rule 12(f)'s extraordinarily high standard, nor could they do so. As a general rule, "allegations supplying background or historical material or other matter of an evidentiary nature will not be stricken unless unduly prejudicial to defendant[s]." *Begay v. Pub. Serv. Co. of N.M.*, 710 F. Supp. 2d 1161, 1185 (D.N.M. 2010) (citing *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 402 F. Supp. 636, 637–38 (S.D.N.Y. 1975)). As discussed in detail next, plaintiffs' novel allegations provide background information about the alleged conspiracy, offer additional detail, or otherwise "buttress" the central theory of both the putative class and plaintiffs, that defendants conspired to raise rail freight rates through the imposition of artificially high independent fuel surcharges. *Abraha v. Colonial Parking, Inc.*, 243 F. Supp. 3d 179, 193 (D.D.C. 2017). As such, far from being immaterial or impertinent,

they are "potentially relevant" to plaintiffs' claims.  *Lynch v. Southampton Animal Shelter Found. Inc.*, 278 F.R.D. 55, 65 (E.D.N.Y. 2011); *see also Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) ("[N]either a district court nor an appellate court should decide to strike a portion of the complaint on the grounds that the material could not possibly be relevant on the sterile field of the pleadings alone.").  Though plaintiffs cannot seek damages for their time-barred allegations, the Court agrees that they "should be permitted to pursue their theory" of the conspiracy, as bolstered by allegations that may otherwise be time-barred.  NYK Pls.' Opp'n to UP & BNSF Defs.' Mot. Dismiss or Mot. Strike ("NYK Pls.' Opp'n") at 22, ECF No. 305 (citing *FTC v. Lukens Steel Co.*, 444 F. Supp. 803, 805–06 (D.D.C. 1977)).  Put simply, defendants are not prejudiced by the inclusion of the challenged allegations in plaintiffs' complaints, even if some allegations are time-barred to support a damages award.

### C.  Definition of *MDL I* Putative Class

As a threshold issue, the parties dispute the parameters of the *MDL I* class that should guide the comparison with the ten challenged complaints.  Plaintiffs contend that the putative class as described in the Class Complaint should determine the claims encompassed by *MDL I* and tolled by *American Pipe*.  *See* NYK Pls.' Opp'n at 12 ("Plaintiffs' reliance on the scope of the class plead [sic] in the Class Complaint was both reasonable and consistent with the policies underlying *American Pipe* tolling."); "K" Line & Yang Ming Pls.' Opp'n Defs.' Mot. Partial Dismissal or Mot. Strike Their Compls. ("Kawasaki & Yang Ming Pls.' Opp'n") at 10, ECF No. 294 (same).[9]  Defendants, on the other hand, point to the putative class as defined in the motion for class certification as the appropriate measure.  *See* Defs.' Reply Supp. Mot. Dismiss Pls.'

---

[9]        Anheuser-Busch plaintiffs join the arguments raised in support of *American Pipe* tolling in the opposition briefs of omnibus plaintiffs and Kawasaki and Yang Ming plaintiffs.  *See* Anheuser-Busch, LLC & Anheuser Busch Cos., LLC's Opp'n Defs.' Mot. Partial Dismissal Am. Compl. ("Anheuser-Busch Pls.' Opp'n") at 8 n.5, ECF No. 306 (first citing Pls.' Omnibus Opp'n; and then citing Kawasaki & Yang Ming Pls.' Opp'n).

Compl. or Mot. Strike ("Defs.' NYK Reply") at 7, ECF No. 309 ("[C]ases are clear that the class certification motion controls the scope of the putative class's claims.") (first citing *Pennington*, 352 F.3d 884; and then citing *Sawtell v. E.I. du Pont de Nemours & Co.*, 22 F.3d 248 (10th Cir. 1994)); Defs.' Reply Supp. Mot. Partial Dismissal or Mot. Strike Compls. Pls. Kawasaki & Yang Ming ("Defs.' Kawasaki & Yang Ming Reply") at 5, ECF No. 308 (same); Defs.' Anheuser-Busch Reply at 7 ("[The class certification motion] is dispositive as to the scope of the putative class's claims.") (first citing *Pennington*, 352 F.3d 884; and then citing *Sawtell*, 22 F.3d 248). The Court agrees with defendants.

The Class Complaint proposed a class of direct purchasers of rail freight transport who were assessed any separate rail fuel surcharge, Class Compl. ¶¶ 1–2, 38, even though this complaint raised specific allegations of illegality only as to rate-based fuel surcharges, *id.* ¶ 5, over a minimum four-year time period "from July 1, 2003 until at least June 30, 2007," *id.* ¶ 1. Thereafter, the *MDL I* plaintiffs moved to certify a class of direct purchasers of rail freight transport who were assessed "a standalone rail freight fuel surcharge applied as a percentage of the base rate" over the five-and-a-half-year period "from July 1, 2003 until December 31, 2008." Class Certification Mot. at 1.  In other words, the putative class for which certification was sought is more narrowly defined, with a more precise time period, than that described in the Class Complaint.

When faced with inconsistencies between the class described in a complaint and the class plaintiffs ultimately sought to have certified, the Fourth and Tenth Circuits have held that "where plaintiffs move for class certification by unambiguously asserting a class definition more narrow than that required by their complaint, their asserted class for tolling purposes is that more narrow definition."  *Pennington*, 352 F.3d at 894; *see also Sawtell*, 22 F.3d at 253 (finding that

"[a]lthough the complaints filed in the . . . class actions were broad in their descriptions of the class, when the plaintiffs moved for class certification . . . , the narrowness of the class definitions was clear" and therefore looking to the class moved to be certified for tolling purposes). The narrower definition of the class controls from the moment put forward by putative class plaintiffs, and "[i]t then follows that for parties [or claims] outside that asserted class, tolling will be unavailable" unless putative class plaintiffs repudiate the narrower definition and provide adequate notice to defendants that they intend to prosecute claims on behalf of a more encompassing class. *Pennington*, 352 F.3d at 894.[10]

This rule promotes the policies of *American Pipe*. By moving to certify a class with specific parameters that may be more refined than as outlined in the complaint, a putative class plaintiff signals to defendants that the broader set of claims will not be pursued in the ensuing class litigation, should certification be granted. From that point until plaintiffs notify defendants that a broader set of claims has been revived, defendants are justified in relying on the putative class that plaintiffs move to certify for awareness of "the contours of potential claims" they may have to defend. *McCarthy*, 562 F.2d at 1275. The class definitions at the certification stage will therefore shape defendants' understanding of the scope of the claims at issue, the conduct the putative class challenges, and the relevant evidence they must preserve. To allow former putative class members to rely on a broader class definition that former class plaintiffs themselves abandoned would spring an "unfair surprise," *Crown*, 462 U.S. at 353, on defendants.

---

[10]      NYK plaintiffs overread language in *Crown* stating that "the '*class complaint* notifies the defendants not only of the substantive claims being brought against them, but also of the number and generic identities of the potential plaintiffs who may participate in the judgment'" to argue that the class complaint is the exclusive source of notice for *American Pipe* purposes. NYK Pls.' Opp'n at 9 (supplying emphasis and quoting *Crown*, 462 U.S. at 353). The quoted language simply indicates that notice may be provided by "a class complaint," without restricting tolling to what is said in that complaint, and neither *Crown* nor any other binding decision indicates that a class complaint supersedes later representations by plaintiffs in class proceedings. *Crown*, 462 U.S. at 353.

At the same time, the Class Complaint continues to play a central role in providing notice to defendants of "the contours of potential claims," *McCarthy,* 562 F.2d at 1275, and thus in determining the scope of the notice provided to defendants in subsequent class proceedings, subject to the express limits imposed by any refined class definition.  Ultimately, the class for which certification was sought defines the scope of the claims and claimants on whose behalf the putative class plaintiffs intended to litigate.  *See, e.g.*, *In re Linerboard Antitrust Litig.*, 504 F. Supp. 2d 38, 46–47 (E.D. Pa. 2007) (looking to both the narrower class definitions used at the certification stage and the allegations in the class complaint to determine whether *American Pipe* tolled plaintiffs' claims).

In *MDL I*, putative class plaintiffs moved to certify a more refined class than proposed in their Class Complaint, *compare* Class Compl. ¶ 38, *with* Class Certification Mot. at ¶ 1, and consistently maintained this class definition throughout the lengthy decades-long class certification proceedings in *MDL I.  See MDL I–D.C. Cir. 2019 Op.*, 934 F.3d at 621 ("The proposed class consisted of all shippers who paid rate-based fuel surcharges for unregulated services purchased from the defendants between July 1, 2003 and December 31, 2008."); *MDL I–D.C. Cir. 2013 Op.*, 725 F.3d at 249 n.3 (noting that "plaintiffs proposed" a class consisting of "[a]ll entities or persons that at any time from July 1, 2003 until December 31, 2008 (the 'Class Period') purchased rate-unregulated rail freight transportation services directly from one or more of the [d]efendants, as to which [d]efendants assessed a stand-alone rail freight fuel surcharge applied as a percentage of the base rate for the freight transport") (quoting *MDL I–D.D.C. 2012 Op.*, 287 F.R.D. at 12)); *MDL I–D.D.C. 2017 Op.*, 292 F. Supp. 3d at 33 (considering "whether . . . to certify a class of: [a]ll entities that at any time from July 1, 2003 until December 31, 2008 (the 'Class Period') purchased rate-unregulated rail freight transportation services

directly from one or more of the [d]efendants, as to which [d]efendants assessed [a rate-based fuel surcharge]"); *MDL I–D.D.C. 2012 Op.*, 287 F.R.D. at 12 ("Specifically, plaintiffs move this Court . . . for certification of a class of [a]ll entities that at any time from July 1, 2003 until December 31, 2008 (the 'Class Period') purchased rate-unregulated rail freight transportation services directly from one or more of the [d]efendants, as to which [d]efendants assessed a stand-alone [rate-based fuel surcharge].").  The ten years of litigation over class certification certainly indicated to defendants that the refined class definition at issue in those proceedings reflected the scope of the claims the putative class would have brought against defendants.  The specific class period, and the specification of rate-based fuel surcharges as the subject of the putative class's litigation, therefore set the initial parameters for the *American Pipe* inquiry.

Plaintiffs resist being restricted to the class definition in the *MDL I* plaintiffs' certification motion, citing *Choquette v. City of New York*, 839 F. Supp. 2d 692 (S.D.N.Y. 2012), for the notion that defendants "are justified in relying upon the class certification motion to indicate the absence of a particular class in the litigation" only in cases where "there is ambiguity regarding the class definition asserted in the complaint," *id.* at 701; *see* Kawasaki & Yang Ming Pls.' Opp'n at 10–12; NYK Pls.' Opp'n at 12–14.  *Choquette* does not help plaintiffs.  In that case, the court made clear that once the court denies certification, the definition on which the court rules defines the class for tolling purposes because it is the claims of that class, not the class proposed in the complaint, which are "foreclosed from the litigation."  *Choquette*, 839 F. Supp. 2d at 701.

Still relying on *Choquette* and cases adopting its methodology, plaintiffs contend that the Class Complaint controls "barring an amendment to the Class Complaint, or a definitive decision by a court that [p]laintiffs' . . . claims would be excluded from the class."  NYK Pls.' Opp'n at

12 (citing *Choquette*, 839 F. Supp. 2d at 701, and collecting cases); Kawasaki & Yang Ming Pls.' Opp'n at 10 (same).  In urging that this reading of *Choquette* would return focus to the Class Complaint, plaintiffs neglect to account for the fact that a definitive decision exists here: the class initially certified in *MDL I*, and disputed by the parties for years after, clearly did not encompass either plaintiffs' claims outside the class period or plaintiffs' claims about fuel surcharges other than rate-based fuel surcharges.  *See MDL I–D.D.C. 2012 Op.*, 287 F.R.D. at 74.  From the time *MDL I* plaintiffs proposed a refined class, broader class claims were excluded from the litigation, with no reasonable possibility of "their inclusion in [the] class action" to continue tolling.  *In re Initial Pub. Offering Secs. Litig.*, 617 F. Supp. 2d 195, 200 (S.D.N.Y. 2007).  Thus, under *Choquette*'s reading of *American Pipe* tolling, the asserted class for tolling purposes is the class that putative class plaintiffs unsuccessfully sought to have certified in *MDL I*.

Plaintiffs persist in harkening back to the Class Complaint's definition of the putative class, suggesting that the practice, common among class plaintiffs, of moving "to certify a damages class that ends on a date prior to the filing of their class certification motion" and later seeking "expanded damages periods that include conduct or transactions post-dating the originally certified class," should inform the tolling of their claims.  NYK Pls.' Opp'n at 11; *see also id.* at 11–12 (collecting cases); Kawasaki & Yang Ming Pls.' Opp'n at 9–10 (same).  Based on this practice, plaintiffs contend they justifiably relied on the scope of the class pled in the Class Complaint, rather than the class proposed for certification.  Under this theory, class certification becomes simply a tool to advance litigation, without any fixed meaning for the affected defendants, since the class complaint remains the lodestar allowing *American Pipe* tolling for any absent former putative class member to bring individually claims dropped by the

putative class that would otherwise be time-barred.  This proposal would "simultaneously extend *American Pipe* tolling" to claims abandoned by the putative class and "undermine the rationales that undergird it."  *Perrow v. District of Columbia*, 435 F. Supp. 3d 9, 14 (D.D.C. 2020) (rejecting plaintiff's suggestion that an untimely motion for extension of time to seek class certification tolled the statute of limitations for putative class members).  Where *American Pipe* seeks to *balance* the judicial system's interests in efficiency and economy of litigation with defendants' need for certainty by reserving tolling for those claims actually pursued by the putative class, plaintiffs' proposal would introduce intolerable uncertainty, and undermine the principle of fair notice, by tolling the limitations period for claims excluded from the class, on the speculative belief that, had the former class reached the damages stage, they would have sought to revive those dormant claims.[11]

Finally, plaintiffs contend that limiting tolling to the claims pressed by the asserted class is "manifestly unjust" because the rule would "mak[e] it impractical, or even impossible, for putative class members to obtain relief for the full extent of [their] damages."  NYK Pls.' Opp'n at 11 n.7; Kawasaki & Yang Ming Pls.' Opp'n at 9–10 n.3.  Not so.  Though a putative class member may risk forfeiting *American Pipe* tolling by filing an individual action before a decision on class certification, *see Wyser-Pratte Mgmt. Co., Inc. v. Telxon Corp.*, 413 F.3d 553, 568–69 (6th Cir. 2005); *Wachovia Bank & Tr. Co. v. Nat'l Student Mktg. Corp.*, 461 F. Supp. 999, 1012 (D.D.C. 1978), *rev'd on other grounds*, 650 F.2d 342 (D.C. Cir. 1980), this risk is only present for those claims which may benefit from *American Pipe* tolling in the first instance

---

[11]       As explained *infra* Part III.D.3, the goals of *American Pipe* are served by tolling claims for relief that post-date the class period brought by former putative class members whose allegations with respect to conduct mirror the claims of the putative class.  Requiring such plaintiffs to bring separate, timely actions only for damages during the pendency of the class litigation would result in the "needless multiplicity of actions," *Crown*, 462 U.S. at 351, *American Pipe* tolling is meant to avoid.

and those claims are only those actually encompassed by the putative class.  When, as here, a

putative class refines its focus by moving to certify a class that differs from the description

offered in a class complaint, putative class members have the option of preserving broader

claims by filing individual complaints alleging anticompetitive conduct that occurred outside the

class period or that sought to fix non-rate-based fuel surcharges.  The option they do not have is

to "sleep[] on their rights" during the pendency of the class litigation, *Crown*, 462 U.S. at 352,

and then "raise different or peripheral claims following denial of class status" in reliance on the

class action, *id.* at 354 (Powell, J., concurring).

With this threshold issue resolved, the next inquiry is whether the claims brought by the

putative class in *MDL I*, as refined in the class certification motion, gave defendants adequate

notice of plaintiffs' novel allegations in the challenged ten complaints, such that tolling under

*American Pipe* is appropriate.

### D.        Novel Allegations in Ten Challenged Complaints

As already noted, the novel allegations that defendants contend warrant the dismissal or

striking, in whole or in part, of ten of the *MDL II* complaints are that (1) three additional

railroads participated as co-conspirators; (2) defendants coordinated the uniform implementation

of mileage-based fuel surcharges in addition to rate-based fuel surcharges; and (3) defendants'

conspiratorial conduct, and its effects, transpired outside of the 2003–2008 period defining the

*MDL I* putative class.  Each category of novel factual allegations in the ten challenged

complaints present different questions as to whether *MDL I* provided defendants with fair notice

or whether their late arrival prejudices defendants.  Each is addressed in turn.

#### 1.   *Allegations that Three Additional Railroads Participated in the Conspiracy*

Defendants move to dismiss or strike omnibus plaintiffs' allegations that CN, CP, and

KCS conspired with defendants to increase rail freight prices, *see, e.g.*, Defs.' AM Mem. at 11–

12; Defs.' Consol. Reply at 7–9, contending that these allegations should not be tolled under *American Pipe* because "those three railroads were not alleged to have conspired in [*MDL I*] and their conduct was not litigated by the class," Defs.' Consol. Reply at 7.  As a result, defendants lacked notice that *MDL I*, or the individual cases in *MDL II*, might expand to include overcharge claims from customers of CN, CP, and KCS, in addition to defendants' customers.  *See, e.g.*, Defs.' AM Mem. at 11.  Allowing allegations against these three additional railroads to proceed at this late stage, according to defendants, "would cause discovery and evidentiary nightmares that *American Pipe* is designed to avoid: collection and production of documents, and depositions of witnesses, for evidence going back *nearly twenty years*" from corporations with no reason to have preserved such evidence.  *Id.*  Indeed, CN and CP were never named by the putative class as either defendants or co-conspirators.  KCS was named as a defendant by some of the individual plaintiffs before consolidation into *MDL I*, but was omitted as a defendant in the first consolidated class complaint.  *See supra* n.6*; see also* Consolidated Am. Class Action Compl., *MDL I*, No. 07-mc-00489-PLF-GMH, MDL No. 1869 (D.D.C. Apr. 15, 2008), ECF No. 91-2.  The putative class consistently named only CSX, Norfolk Southern, BNSF, and Union Pacific as defendants.  *See, e.g.*, Class Compl. ¶ 2; *MDL I–D.C. Cir. 2019 Op.*, 934 F.3d at 620 ("The defendants are the four largest freight railroads in the United States: BNSF Railway Company; CSX Transportation, Inc.; Norfolk Southern Railway Company; and Union Pacific Railroad Company.").

As already discussed, *American Pipe* tolling seeks to achieve balance between "efficiency and economy of litigation," the goals of Rule 23, *Am. Pipe*, 414 U.S. at 553, and the statute of limitations policies of "essential fairness," *id.* at 554, by allowing tolling for absent former putative class members only when defendants receive fair notice of the subject matter and

size of the prospective litigation from the class action.  A party who is never named in the earlier proceedings, for example, does not receive notice of potential claims against them and cannot be "aware of the need to preserve evidence and witnesses."  *Crown*, 462 U.S. at 353.  For this reason, courts consistently hold that *American Pipe* tolling does not apply to entities or individuals not named as defendants by the putative class.  *See, e.g.*, *Wyser-Pratte Mgmt. Co.*, 413 F.3d at 567–68 (affirming dismissal of newly added defendant on statute of limitations grounds because "the class action must afford defendant with adequate notice" for *American Pipe* tolling to apply); *In re Enron Corp. Secs.*, 465 F. Supp. 2d 687, 730 (S.D. Tex. 2006) (finding that *American Pipe* tolling "cannot apply to claims against [d]efendants not named in [the original class action]" because the newly added defendants "were not on notice of the claims against them"); *Wachovia Bank & Tr. Co.*, 461 F. Supp. at 1012 ("Since [newly added defendants] were not named in the original [class] actions, they cannot fairly be charged with the notice requisite for class action tolling.").

Omnibus plaintiffs implicitly recognize this unfairness by not naming CN, CP, and KCS as defendants, but merely as non-party co-conspirators.  To the extent that any allegations involving these three alleged non-party co-conspirators are intended to change "the contours of potential claims" against defendants, *McCarthy*, 562 F.2d at 1275, by increasing the number of claimants to include direct purchasers of unregulated rail freight services from CN, CP, and KCS and the scope of potential damages claims from defendants' customers who also purchased rail freight services from CN, CP, and KCS, such potential claims would be time-barred.  The putative class, which cabined its membership to "direct purchasers of rail freight transportation services from [d]efendants," Class Compl. ¶ 38; Class Certification Mot. at 1, did not provide defendants with adequate notice of their potential liability for this expanded universe of claims.

As a result, defendants were not aware of their obligation to preserve "evidence, memories, and witnesses" relevant to CN, CP, and KCS's alleged involvement in the conspiracy. *Am. Pipe*, 414 U.S. at 562 (Blackmun, J., concurring). Requiring them to vindicate the actions of previously-unnamed co-conspirators at this late date would result in precisely the sort of unfair surprise *American Pipe* seeks to avoid.

Omnibus plaintiffs posit that allegations concerning CN, CP, and KCS should be subject to *American Pipe* tolling because "as a matter of black letter law . . . a conspirator is always liable under the antitrust laws for the acts of his co-conspirators." Pls.' Omnibus Opp'n at 17 (citing *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1052–53 (9th Cir. 1981)). This confuses the issue: the question is not whether, under the antitrust laws, defendants are or could be liable for CN, CP, and KCS's involvement in the conspiracy alleged by omnibus plaintiffs. Instead, the question is whether omnibus plaintiffs' otherwise time-barred claims with respect to these three railroads are in fact timely because of *American Pipe* tolling. Perhaps the putative class, or omnibus plaintiffs in a timely-filed individual suit, could have sought to hold defendants liable for their alleged co-conspirators' misdeeds in the first instance. At issue here, however, is whether the suit in fact litigated by the putative class gave defendants fair notice that the potential claims against them encompassed the alleged activities of CN, CP, and KCS, such that tolling of the statute of limitations promotes justice as well as economy of litigation.

To this point, omnibus plaintiffs suggest that the putative class proceedings gave defendants fair notice of the three railroads' alleged involvement in three ways. First, according to omnibus plaintiffs, the putative class's allegations with respect to the AAR should have indicated to defendants that the conduct of CN, CP, and KCS was at issue since the putative class

alleged that (1) the CEOs of CN, CP, and KCS were "key members of the AAR's board of directors" during the relevant time period, Pls.' Omnibus Opp'n at 6; (2) "[t]he record developed by Former Class Plaintiffs shows that these three railroads used the AAR board to conspire with [d]efendants," *id*.; and (3) defendants "have long been on notice of the instrumental role that Class Plaintiffs alleged AAR had in enabling" the alleged conspiracy, *id.* at 18.  To be sure, the putative class, like omnibus plaintiffs, alleged that manipulation of the AAR board was essential to implementing defendants' conspiracy, *see, e.g.*, Class Compl. ¶¶ 9–11, but the putative class's allegations focused on the defendants' role in the AAR, specifying that "[d]efendants BNSF, UP, CSX, and NS conspired to cause the AAR to develop and publish a new cost escalation index with fuel removed," *id.* ¶ 9, without any mention of CN, CP, or KCS's potential involvement.  To bolster their claim that the record developed in *MDL I* demonstrates CN, CP, and KCS's use of the AAR board to conspire with defendants, omnibus plaintiffs cite to a 2007 STB decision, STB Ex Parte No. 661, that they assert "describ[es] CP and CN's parallel imposition of rate-based fuel surcharges."  Pls.' Omnibus Opp'n at 6 (citing STB Ex Parte No. 661 at 8).  In fact, the STB decision makes no findings regarding individual railroads' fuel surcharge programs, explaining that, given the limited scope of its regulatory authority, the STB's findings "apply only to regulated common carrier traffic," not to unregulated private transportation contracts such as those at issue here.  STB Ex Parte No. 661 at 13.  While defendants may have been on notice of the putative class's allegations concerning AAR's alleged role in implementing the conspiracy, such general allegations made by the putative class about AAR did not provide fair notice of potential claims specific to three AAR board members and their contracts with customers.

Second, omnibus plaintiffs contend that defendants were on notice of CN, CP, and KCS's alleged involved through the discovery process in *MDL I*, during which "CN and KCS were subpoenaed" and "[d]efendants also certainly encountered requests and materials . . . regarding their own records of the involvement of the AAR, CN, CP, and KCS in the conspiracy." Pls.' Omnibus Opp'n at 18. This contention falls short of being persuasive. A subpoena to a third party under Federal Rule of Civil Procedure 45 signals only that the third party may have custody of relevant information, not that the third party's conduct is itself at issue in the litigation. Thus, issuance of subpoenas to CN and KCS, without more, does not provide defendants with fair notice that the putative class, or omnibus plaintiffs, might press claims stemming from CN and KCS's alleged involvement in the conspiracy. Moreover, given that defendants' alleged influence on the AAR and its board to implement the price-fixing conspiracy was central to the putative class's theory of the case, *see, e.g.*, Class Compl. ¶¶ 8–9, discovery requests and productions related to the AAR board and its members were inevitable and therefore are insufficient to provide adequate notice of specific claims against those entities that omnibus plaintiffs now allege "were put at issue" in *MDL I*, Pls.' Omnibus Opp'n at 18.

Finally, omnibus plaintiffs argue that the putative class action provided fair notice with respect to CN, CP, and KCS because "it is [d]efendants who were sued for conspiracy to fix prices, and it is [d]efendants who must know who their co-conspirators are." *Id.* at 18. This argument assumes too much that remains unproven. *American Pipe* plainly requires that fair notice come not from assumptions about defendants' independent knowledge, but rather from "the commence[ment of] a suit" by a putative "representative of a class." 414 U.S. at 555. The scope of the notice defendants received in *MDL I* of the potential claims against them did not embrace the activities of CN, CP, and KCS or the possibility of claims brought by their

customers.  Omnibus plaintiffs' allegations concerning these three railroads thus alter "the contours of potential claims" against defendants, *McCarthy*, 562 F.2d at 1275, such that *American Pipe* does not apply, and allegations that these additional railroads participated in the alleged price-fixing conspiracy are therefore time-barred for purposes of potential damages.

### 2.  *Mileage-based Fuel Surcharge Allegations*

Defendants next move to dismiss or strike allegations made by omnibus plaintiffs and Anheuser-Busch plaintiffs presenting a theory of liability for damages based on defendants' alleged imposition of fuel surcharges other than the rate-based fuel surcharges at issue in *MDL I*. These allegations concern different acts of defendants than the conduct alleged by the putative class, occurred in a different time frame, and turn on new evidence.  For these reasons, *MDL I* did not provide defendants with adequate notice of plaintiffs' non-rate-based fuel surcharge allegations, as explained below, and such an expansion of the claim is therefore time-barred.

### a.  **Omnibus Plaintiffs**

With respect to omnibus plaintiffs, defendants move to dismiss their allegations that beginning in early 2007, defendants conspired to impose mileage-based fuel surcharges in their unregulated rail freight traffic contracts, *see, e.g.*, AM Compl. ¶¶ 12, 93–96, and eventually abandoned the rate-based fuel surcharge condemned by the STB as applied to regulated traffic, in favor of an artificially high mileage-based fuel surcharge, *see, e.g.*, *id.* ¶¶ 93–95.  Defendants contend these allegations should not be tolled under *American Pipe* because the conspiracy alleged by the putative class in *MDL I* was "expressly and fundamentally limited to *rate-based* fuel surcharges" and "[d]efendants therefore had no notice" that omnibus plaintiffs' claims "would concern . . . fuel surcharges different from those alleged by the putative class."  Defs.' AM Mem. at 13.  Omnibus plaintiffs counter that their allegations concerning mileage-based fuel

surcharges do not describe a second conspiracy among defendants, but only a second method, that of "double dipping," by which defendants implemented their "single conspiracy" to raise rail freight rates overall.  Pls.' Omnibus Opp'n at 12; *see id.* at 12–13.  According to omnibus plaintiffs, this "double dipping" method encompassed both rate-based and mileage-based fuel surcharges and was a factor in the putative class's damages calculations in *MDL I*.  *Id.* at 12–13. The district court, they observe, acknowledged that the STB's 2007 decision, which described and condemned railroads' use of "double dipping" in the regulated freight context, provided "empirical evidence" for the existence of the practice.  *Id.* at 9 (citing *MDL I–D.D.C. 2017 Op.*, 292 F. Supp. 3d at 122).

In the context of regulated rail freight traffic, the STB defined double dipping as "double recovery for the same fuel cost increase," which "can occur when a carrier both escalates a base rate using an index (such as the RCAF) that includes changes in the cost of fuel and applies a fuel surcharge to the same movement covering the same period."  STB Ex Parte No. 661 at 10. In other words, double dipping would have occurred had defendants attempted to adopt independent fuel surcharges while using the AII to calculate increases to the base rate.  The district court in *MDL I* adopted this definition of "double dipping," which the putative class also described in its class certification briefing.  *See MDL I–D.D.C. 2017 Op.*, 292 F. Supp. 3d at 36 (referring to the practice of "'imposing a stand-alone fuel surcharge where fuel price increases were already covered by [a cost-escalation index that includes fuel as a cost factor]'" as "'double dipping'") (quoting Pls.' Mem. Supp. Mot. Class Certification at 11, *MDL I*, No. 07-mc-00489-PLF-GMH, MDL No. 1869 (D.D.C. Mar. 30, 2010), ECF No. 339-1); *id.* at 122 (quoting STB Ex Parte No. 661 at 11).  The STB further specified that "the use of both a fuel surcharge along

with a rate escalator [index] would not constitute 'double dipping' . . . when the fuel component

has been subtracted out of the index."  STB Ex Parte No. 661 at 10–11.

Omnibus plaintiffs offer a broader definition of "double dipping," which they say

appeared in *MDL I* to refer to the practice of "imposing standalone fuel surcharges on top of base

rates that already accounted for fuel costs."  Pls.' Omnibus Opp'n at 9; *see also id.* at 12–13.

Both definitions assume that railroads use a base rate that accounts for fuel costs in setting initial

prices.  The base rate covers railroads' actual fuel costs at the time of its implementation, but if

fuel prices go up, the base rate no longer accurately reflects actual fuel costs.  To recover the

increase in fuel costs, railroads seek a way to pass on the change in price to customers.  This goal

may be achieved using one of two methods: (1) a cost-escalation index, such as the AII or RCAF

that includes fuel as a cost factor and therefore periodically increases the base rate to reflect

increases in fuel costs; or (2) an independent fuel surcharge charged in addition to the base rate.

To permissibly use this second tool, the base rate must be increased per a cost-escalation index

that excludes fuel as a cost factor, like the AIILF.

The STB's definition of double dipping and omnibus plaintiffs' definition diverge in how

they treat these two mechanisms by which railroads recover increases in fuel costs.  Under the

STB's definition, as adopted by the *MDL I* court and the putative class, railroads double dip

when they use both tools simultaneously because they recover increases in fuel costs twice: once

when they increase the base rate using a cost-escalation index that accounts for changes in fuel

costs and again when they impose an independent fuel surcharge.  For omnibus plaintiffs,

however, double dipping occurs whenever railroads impose an independent fuel surcharge in

addition to the base rate, regardless of whether the cost-escalation index applied to increase the

base rate includes fuel as a cost factor.  Under omnibus plaintiffs' definition then, a railroad

impermissibly "double dips" by charging an independent fuel surcharge while using a cost-escalation like the AIILF that excludes fuel, notwithstanding that, in this scenario, the railroad would recover its increased fuel costs only once, through the independent fuel surcharge, because changes to its base rate would not reflect changes in fuel costs. In contrast, under the STB's definition, this same behavior "would not constitute 'double dipping.'"  STB Ex Parte No. 661 at 10.

The omnibus plaintiffs argue that the activity of "double dipping," as that term was used in *MDL I* and the STB, covers their allegations of defendants "impos[ing] standalone fuel surcharges, whether rate- or mileage-based, on top of base shipping rates that already accounted for the costs of fuel."  Pls.' Omnibus Opp'n at 12–13; *see also id.* at 9–10.  Their use of the term is thus inconsistent with the definition of double dipping used by the STB and in *MDL I*.  As a result, for purposes of tolling, this different definition of double dipping—designed to encompass mileage-based fuel surcharges—reflects a significant broadening of activity alleged to be anti-competitive in *MDL I*'s Class Complaint and is exactly the practice that, according to the STB, could constitute an exception to impermissible "double dipping" under its definition.  STB Ex Parte No. 661 at 10–11.  In short, the putative class's damages expert's position that defendants "double dipped," as defined by the STB and *MDL I*, *see MDL I–D.D.C. 2017 Op.*, 292 F. Supp. 3d at 122; Pls.' Omnibus Opp'n at 9–10, 12–13, and the judicial finding in *MDL I* that the STB's 2007 decision supplied "empirical evidence" for the practice of double dipping, as defined by the STB, *MDL I–D.D.C. 2017 Op.*, 292 F. Supp. 3d at 122; Pls.' Omnibus Opp'n at 9, 13, does not supply notice to defendants of omnibus plaintiffs' allegations that the alleged conspiracy was implemented by "double dipping" with mileage-based fuel surcharges.

Omnibus plaintiffs draw on the double-dipping concept to bolster their contention that the putative class's allegations against defendants provided notice of a broad conspiracy to "increas[e] rail freight rates" not only by "agreeing to implement identical inflated, rate-based fuel surcharges," but also by "applying standalone fuel surcharges on top of base rates that already included a fuel component," Pls.' Omnibus Opp'n at 9, and that these allegations reach far enough to cover both rate-based and mileage-based fuel surcharges.  To the extent that this theory refers to rate-based fuel surcharges, omnibus plaintiffs simply elaborate on the allegations made by the putative class.  Indeed, from the filing of the Class Complaint, the putative class consistently put forth a theory that defendants imposed, in lockstep, inflated "stand-alone" fuel surcharges, which were "applied as a percentage against the total cost of the freight transportation" (*i.e.*, rate-based), Class Compl. ¶ 5, and which were assessed to customers in addition to the base rate, with the effect of "impos[ing] price increases on the entire cost of rail freight transport," *id.* ¶ 67.

The "standalone fuel surcharges" contested by the putative class, however, were always rate-based fuel surcharges.  While the Class Complaint contained a broad definition of rail fuel surcharges, the conspiracy alleged, and resulting harms, were implemented through specific conduct of defendants: first, their efforts to cause the AAR to embrace the AIILF and second, their development and imposition of a single type of fuel surcharge program under which surcharges were "applied as a percentage against the total cost of the freight transportation." Class Compl. ¶ 5.  The class the *MDL I* plaintiffs moved to certify—the controlling class for *American Pipe* purposes—expressly rejected the more expansive definition of rail fuel surcharges used in the Class Complaint in favor of a narrower definition of the fuel surcharges at issue as rate-based fuel surcharges, *see* Class Certification Mot. at 1, and the class certification

proceedings in *MDL I* consistently moved forward on this narrower theory, *see, e.g.*, *MDL I–D.C. Cir. 2019 Op.*, 934 F.3d at 621 (listing as members of the putative class "all shippers who paid rate-based fuel surcharges"); *MDL I–D.D.C. 2017 Op.*, 292 F. Supp. 3d at 36 (explaining the putative class's allegations as a theory that defendants allegedly conspired to impose an inflated fuel surcharge "as a percentage multiplier of the base rate"); Class Certification Mot. at 1 (defining the proposed class as purchasers of direct unregulated rail freight services who paid a "standalone rail freight fuel surcharge applied as a percentage of the base rate for the freight transport"). Even the damages analysis upon which the *MDL I* plaintiffs relied calculated damages based on an "all-in rate," *MDL I–D.D.C. 2017 Op.*, 292 F. Supp. 3d at 142, which consisted of "a base rate and a fuel surcharge applied as some percentage of the base rate," *id.* at 36. Omnibus plaintiffs' mileage-based fuel surcharge claims were not encompassed by the putative class, and therefore are not tolled.

To conclude otherwise and find, as omnibus plaintiffs' urge, that the putative class's claims particular to rate-based fuel surcharges provided defendants with notice of omnibus plaintiffs' allegations related to mileage-based fuel surcharges would subvert *American Pipe*'s requirement that the individual and class actions be "predicated on the same acts" of defendants, *McCarthy*, 562 F.2d at 1275, to ensure defendants had notice of the substantive claims against them and the number of potential claimants. Individual claims of price-fixing through alternate means often involve different acts, evidence, and potential plaintiffs from the class action. For this reason, the mere "thematic similarity [of] the common claim of a form of price manipulation" does not, without more, "create the requisite overlap" between the allegations to support *American Pipe* tolling. *Shak v. JP Morgan Chase & Co.*, 156 F. Supp. 3d 462, 477 (S.D.N.Y. 2016); *see also id.* at 475–77 (declining to toll a former putative class member's

individual suit alleging manipulation of the silver futures market in part because the former putative class had alleged price manipulation of a different type of silver derivative); *In re Libor-Based Fin. Instruments Antitrust Litig.*, No. 11 MDL 2262 NRB, 2015 WL 4634541, at *136 (S.D.N.Y. Aug. 4, 2015) (finding that individual plaintiffs' "trader-based claims" could not be tolled on the basis of "persistent suppression" allegations in earlier class action).

The two types of fuel surcharges alleged by omnibus plaintiffs, as two distinct methods of price fixing, represent two different factual theories "predicated" on different acts of defendants. *McCarthy*, 562 F.2d at 1275. Both were allegedly implemented with the goal of increasing overall rail freight rates, but otherwise do not appear rooted in the same conduct. Omnibus plaintiffs claim that defendants imposed rate-based fuel surcharges in 2003 and, after "differentiating" their conspiracy, first introduced mileage-based fuel surcharges in 2007. *See, e.g.*, AM Compl. ¶¶ 7, 93–94. The claims therefore likely do not turn on "the same evidence, memories, and witnesses," *Am. Pipe*, 414 U.S. at 562 (Blackmun, J., concurring), and change the scope of defendants' liability to former putative class members. A stronger factual nexus between the two sets of fuel surcharges might not prohibit tolling, even with a concomitant significant change in defendants' potential liability. *See, e.g.*, *Town of Princeton v. Monsanto Co., Solutia Inc.*, 202 F. Supp. 3d 181, 194–95 (D. Mass. 2016) (tolling a new claim that expanded defendants' liability on such grounds). Without more substantial overlap between the mileage-based and rate-based fuel surcharge allegations, however, omnibus plaintiffs' addition of the mileage-based fuel surcharge allegations alters "both the subject matter and size of the prospective litigation." *Am. Pipe*, 414 U.S. at 555. Tolling of these claims would therefore create undue prejudice to defendants. *See Crown*, 462 U.S. at 353.

Quoting *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962),

omnibus plaintiffs contend that they "'should be given the full benefit of their proof without

tightly compartmentalizing the various factual components.'"  Pls.' Omnibus Opp'n at 13

(quoting *Cont'l Ore*, 370 U.S. at 699).  In context, this quoted language is not helpful to omnibus

plaintiffs' position.  The Supreme Court was addressing the standard for appellate review of the

sufficiency of evidence in a jury trial to support a verdict against alleged conspirators for

"liability under the antitrust laws."  *Cont'l Ore*, 370 U.S. at 699; *see also id.* at 697–99.  The

rationale for requiring a holistic consideration of the trial evidence on appellate review, just as a

jury is privy to all of that evidence, has no bearing on the *American Pipe* analysis, which limits

class action tolling to claims with the same factual basis as the former class allegations to ensure

fair notice to defendants.  Those are two entirely different inquiries.[12]  Thus, whether the

mileage-based fuel surcharge allegations are best construed in isolation as pointing to a second

conspiracy, as defendants submit, *see, e.g.*, Defs.' AM Mem. at 13, or as a second means of

implementing the "single conspiracy" originally pled by the putative class and alleged by

omnibus plaintiffs, as omnibus plaintiffs would have it, *see* Pls.' Omnibus Opp'n at 12–13, is

irrelevant to the inquiry of whether defendants had notice from *MDL I* they would have to defend

against this claim.  They did not.

The *MDL I* putative class proceedings did not provide defendants with adequate notice of

omnibus plaintiffs' allegations that defendants manipulated overall rail freight prices through the

---

[12]        Similarly, omnibus plaintiffs' claim that courts in this District "steadfastly follow[] the dictates of *Continental Ore* at the pleading stage," Pls.' Omnibus Opp'n at 13, is unpersuasive.  The cases cited apply the logic of *Continental Ore* when considering whether plaintiffs' allegations are adequately pled under *Twombly*, *Jung v. Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119, 157, 160 (D.D.C. 2004), or the earlier, more permissive pleading rule of *Conley v. Gibson*, 355 U.S. 41 (1957), *In re Consumer Credit Counseling Servs. Antitrust Litig.*, Nos. MDL 97MS233 (RMU), 97-CV-1741, 1997 WL 755019, at *4 (D.D.C. Dec. 4, 1997), or evaluating the merits of motions to sever defendants, *In re Vitamins Antitrust Litig.*, No. MISC 99-197 (TFH), 2000 WL 1475705, at *17 (D.D.C. May 9, 2000).  These are different inquiries, more amenable to the holistic approach encouraged by *Continental Ore*, than the *American Pipe* analysis.

use of mileage-based fuel surcharges.  To the extent these allegations are included in omnibus plaintiffs' complaints to support a damages demand, they are time-barred.

### b. Anheuser-Busch Plaintiffs

Anheuser-Busch plaintiffs allege in a single paragraph in their complaint that defendants "used the conspiracy" pressed by the putative class to implement "other types of fuel surcharges."  Anheuser-Busch Compl. ¶ 27.  While somewhat vague, this targeted language appears intended to reach "other," non-rate-based surcharges that were not at issue in *MDL I*, and would alter the scope of the litigation by inviting claims by non-class-member plaintiffs who did not pay rate-based fuel surcharges but did pay any other type of fuel surcharge to defendants while simultaneously allowing new claims related to other surcharges by former putative class members.  Consequently, this allegation is time-barred for substantially the same reasons as omnibus plaintiffs' mileage-based fuel surcharge allegations.

Anheuser-Busch plaintiffs dispute that their "other surcharge" allegation "opens up a new front in discovery," pointing to the scope of discovery demands made by both sides in this MDL. Specifically, defendants "have already served document requests . . . relating to mileage-based fuel surcharges" in this MDL, Anheuser-Busch Pls.' Opp'n at 3; *see also id.* at 16–18, and the initial document requests served on defendants by all plaintiffs in this MDL asked defendants to produce documents related to fuel surcharges, broadly construed, *id.* at 18–19.  Thus, the Anheuser-Busch plaintiffs claim, the relevant discovery is already underway, and this allegation does not introduce the sort of prejudice to defendants discouraged by *American Pipe*.

The referenced document requests from defendants seek information related to "Rail Fuel Surcharges and any other Fuel Surcharges" or "Fuel Surcharges" generally, Anheuser-Busch Pls.' Opp'n, Wallach Decl. Exh. A (Defs.' Joint First Requests Produc. Docs. Directed to

Anheuser-Busch, LLC & Anheuser-Busch Cos., LLC) at 9–11, ECF No. 306-2, or to "Freight

Transportation Service" by "any mode," *id.* at 3–5, including by "Rail Carrier Alternatives" and

"any other provider" of freight transport, *id.* at 9–11.  Defendants represent that these requests

"concern [their] defenses in this litigation," not plaintiffs' allegations concerning non-rate-based

fuel surcharges, Defs.' Anheuser-Busch Reply at 9, and therefore "are not evidence that

discovery on [the] new claims has started or that a separate discovery effort would not be

necessary," *id.* at 10.  Indeed, defendants' discovery requests are neither an admission of their

awareness of non-rate-based fuel surcharge allegations nor an indication that Anheuser-Busch's

new factual allegations would require no additional evidence.

Likewise, document requests served on defendants by plaintiffs in this MDL cannot

supply the requisite notice.  Anheuser-Busch plaintiffs point to plaintiffs' joint document

requests to defendants, which seek documents "regarding [fuel surcharges] for Plaintiff's Rail

Freight Transportation Services."  Anheuser-Busch Pls.' Opp'n, Wallach Decl. Exh. B (Pls.'

Joint First Request Produc. Docs. to All Defs.) at 10, ECF No. 306-3.  The requests define "fuel

surcharge" as "a separately identified component of the total amount charged for Rail Freight

Transportation Service based on fuel pricing," *id.* at 2, without any restriction to rate-based fuel

surcharges.  Defendants received plaintiffs' document requests on June 15, 2020, *id.* at 11, more

than fifteen years after plaintiffs allege their conspiracy began.  They could not possibly have

received adequate notice of the need to preserve evidence, or defend conduct, related to non-rate-

based fuel surcharges from a request issued only weeks ago.

More to the point, the parties' respective discovery strategies in this MDL are not the

measure of whether *American Pipe* tolling should apply.  The pertinent inquiry here is whether

defendants received sufficient notice in *MDL I* of potential non-rate-based fuel surcharge claims

to be aware of the need to preserve related evidence and thus are not prejudiced by the additional allegations. When that case was filed over a decade ago, the putative class's theory centered on rate-based fuel surcharges, as did the ensuing discovery and class certification proceedings. To the extent that new fact and expert discovery would be required to litigate Anheuser-Busch plaintiffs' "other fuel surcharge" allegation, which may call for evidence that defendants were not on notice to preserve, defendants may be prejudiced. No more need or may be said on this point, however, since no discovery dispute is pending before the Court, but only defense motions to dismiss or to strike.

Anheuser-Busch plaintiffs' argument that defendants have "answer[ed] . . . broader claims in other individual complaints" is similarly unpersuasive. Anheuser-Busch Pls.' Opp'n at 15. The two individual complaints Anheuser-Busch plaintiffs cite as examples in fact limit their allegations to rate-based fuel surcharges. *See* Compl. ¶ 2, *AK Steel Corp. v. BNSF Ry. Co.*, No. 19-cv-02970-BAH (D.D.C. Oct. 2, 2019), ECF No. 1 ("A rate-based rail freight surcharge ('Rail Fuel Surcharge') is a separately-identified fee that railroads included in their calculation of the fee for transportation, with the fee set as a stated percentage of the shipper's rate."); Compl. ¶ 2, *Norfalco LLC v. BNSF Ry. Co.*, No. 20-cv-00471-BAH (D.D.C. Feb. 19, 2020), ECF No. 1 (same). Further, defendants' motions to dismiss omnibus plaintiffs' complaints specifically target omnibus plaintiffs' similar allegations about mileage-based fuel surcharges. *See* Defs.' AM Mem. at 13–14; Defs.' Consol. Reply at 10–12.

In sum, the claims alleged in *MDL I* did not provide defendants with sufficient notice of Anheuser-Busch plaintiffs' "other surcharge" allegation, and its inclusion at this late date would prejudice defendants. This allegation therefore fails to meet the requirements for *American Pipe* tolling, is time-barred and may not support an expanded damages claim.

### 3. *Pre-2003 and Post-2008 Allegations*

Finally, defendants move to dismiss allegations by omnibus plaintiffs, NYK plaintiffs, Kawasaki plaintiffs, and Yang Ming plaintiffs regarding defendants' conduct and the effects of the conspiracy that took place outside of the July 1, 2003 to December 31, 2008 period alleged by the putative class. *See* Class Certification Mot. at 1. Plaintiffs' allegations regarding events or activity before July 1, 2003 or after December 31, 2008, defendants argue, were excluded from the *MDL I* class, raise new factual theories that would require different evidence, and run contrary to the five-and-a-half-year period alleged by the putative class. *MDL I* therefore did not put defendants on notice of these allegations. *See* Defs.' AM Mem. at 12–13; Defs.' NYK Mem. at 9–10; Defs.' Kawasaki & Yang Ming Mem. at 9.[13] On this basis, defendants propose that no allegations that fall outside the class period may be tolled and therefore should be dismissed or stricken. *See* Defs.' Consol. Reply at 12–14; Defs.' Kawasaki & Yang Ming Mem. at 7–10; Defs.' NYK Mem. at 8–10.

This position overreaches for three reasons. First, defendants essentially ask the Court to parse each plaintiff's complaint allegation by allegation and extract those allegations which fall outside the class period. Such rewriting of complaints is not the role of a district court in evaluating a motion to dismiss or to strike. *See, e.g.*, *Dillman v. Tuolumne County*, No. 1:13-cv-00404 LJO SKO, 2014 WL 2875571, at *2 (E.D. Cal. June 24, 2014) ("This Court, bluntly, is beyond busy. It neither has the time to rewrite complaints, nor does it have a duty in that regard.").

---

[13]     Plaintiffs counter that the Class Complaint alleged a conspiracy to impose rate-based fuel surcharges that continued until "'at least' June 30, 2007" and thereby provided notice to defendants that the putative class alleged a continuing conspiracy that, without more, is presumed to have continued even to the present and encompasses claims outside the class period. *See* Pls.' Omnibus Opp'n at 15 (quoting Class Compl. ¶ 1); NYK Pls.' Opp'n at 9–12; Kawasaki & Yang Ming Pls.' Opp'n at 7–12. Plaintiffs' argument is foreclosed by the determination that the class for which certification was sought in *MDL I* is the controlling class for *American Pipe* purposes.

Second, defendants' challenge to plaintiffs' allegations outside the class period is, at its core, a barely-concealed attempt to limit their potential liability for plaintiffs' "post-2008 damages claims" for the alleged continuing effects of defendants' conspiracy at the outset of this litigation. Defs.' AM Mem. at 13. The lingering effects of a completed conspiracy after a class period may be remediated upon successful proof of the underlying anticompetitive conduct. *See, e.g., Hess v. Inland Asphalt Co.*, No. C-88-242-AAM, 1990 WL 51164, at *10 (E.D. Wash. Feb. 20, 1990) ("Should plaintiffs be able to prove the existence of a conspiracy or concerted action that resulted in inflating prices . . . , they certainly can recover damages for [the lingering effects] of such injury."); *Wilk v. Am. Med. Ass'n*, 671 F. Supp. 1465, 1507 (N.D. Ill. 1987) ("Although the conspiracy ended in 1980, there are lingering effects of the illegal boycott and conspiracy which require an injunction."); *In re Domestic Drywall Antitrust Litig.*, MDL No. 13-2437, 2016 WL 3453147, at *4 n.5 (E.D. Pa. June 22, 2016) ("The parties should not confuse [the conspiracy period] with the possibly different time period for the calculation of damages. It is possible that [plaintiffs] may be able to prove damages for a broader time period than the scope of discovery and liability."). The duration and scope of the alleged effects of the conspiracy cannot be assessed at this stage, before discovery and expert analysis, and the Court will not attempt to prematurely do so. *Cf. In re Loestrin 24 Fe Antitrust Litig.*, 814 F.3d 538, 552–53 (1st Cir. 2016) (rejecting a proposed requirement that plaintiffs provide precise figures and damages calculations at the pleadings stage); *Thompson v. 1-800 Contacts, Inc.*, No. 2:16-cv-1183-TC, 2018 WL 2271024, at *4 (D. Utah May 17, 2018) ("Plaintiffs should not be required to provide an expert affidavit setting out Plaintiffs' economic theory at the motion-to-dismiss stage."); *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 244 (D. Conn. 2015) (finding that issues about the computation of damages "are sufficiently factual to require discovery"). No undue prejudice to

defendants results from tolling plaintiffs' allegations of harm resulting from lingering effects of the conspiracy outside the class period: because the underlying conduct occurred during the class period, defendants have fair notice of their substance, and the number and identities of potential plaintiffs, from the earlier class proceedings.[14]  Whether plaintiffs can prove that their alleged post-2008 harms in fact resulted from defendants' pre-2008 conduct is an issue for future stages of litigation.[15]  Plaintiffs' allegations of harm caused by effects of the July 1, 2003–December 31, 2008 conspiracy that extended beyond December 31, 2008 are tolled.

Third, allegations outside the class period that relate to the conspiracy alleged by the putative class, whether because they explain the history and development of the conspiracy, catalogue closely related misconduct by defendants, or explain plaintiffs' potential damages, may be tolled.  *See, e.g.*, *Renati v. Wal-Mart Stores, Inc.*, No. 19-cv-02525-CRB, 2019 WL 5536206, at *13 (N.D. Cal. Oct. 25, 2019) (tolling claims of plaintiffs who alleged ongoing discriminatory employment practices that were the focus of the prior class action and new

---

[14]     In arguing that the December 31, 2008 end of the class period sets a bound on the purchases of rail freight services for which plaintiffs may seek relief, defendants rely on three cases in which courts declined to toll claims brought by plaintiffs for purchases made outside the class period.  *See* Defs.' Consol. Reply at 12–13, 13 n.14; Defs.' NYK Reply at 9–10; Defs.' Kawasaki & Yang Ming Mem. at 9.  Those case are inapposite.  In two of the cases, plaintiffs alleged no purchases during the class period and therefore were never members of the putative class, unlike plaintiffs here.  *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 486 (S.D.N.Y. 2014); *Mass. Bricklayers & Masons Funds v. Deutsche Alt-A Secs.*, 273 F.R.D. 363, 366 (E.D.N.Y. 2011).  In the third case, the court denied tolling for purchases outside the class period because "[t]he facts underlying . . . plaintiffs' claims based on purchases [after the class period] are entirely different from the facts underlying plaintiffs' claims based on purchases during the class period."  *In re Linerboard Antitrust Litig.*, 504 F. Supp. 2d at 48.  The theme of all three cases is that the timing of a discrete purchase alone is not dispositive.  Rather, courts scrutinize the context and content of allegations concerning purchases outside the class period to determine whether defendants were on notice of the underlying allegations, just as they do when applying *American Pipe* to other potentially tolled claims.

[15]     Defendants further argue that plaintiffs' "lingering effects" allegations are untimely because they do not meet the requirements of "the well-established 'continuing violations' doctrine," another exception to the Clayton Act's statute of limitations.  Defs.' NYK Reply at 12; *see also* Defs.' AM Mem. at 16 ("AM must plausibly allege an 'injurious' or 'overt' act during the four-year limitations period.").  The continuing violations doctrine holds that the Clayton Act's statute of limitations period restarts each time a defendant commits an overt act in furtherance of "a continuing conspiracy to violate the antitrust laws" that results in injury to plaintiffs.  *Zenith Radio Corp.*, 401 U.S. at 338.  This argument, however, holds no weight because plaintiffs' "lingering effects" allegations are tolled under *American Pipe*.

allegations about the continuation of and revisions to the practices and revisions after the class period); *Sharpe v. Am. Exp. Co.*, 689 F. Supp. 294, 301–02 (S.D.N.Y. 1988) (finding timely allegations of ongoing discriminatory conduct that overlapped with the class period, but ended one year later).  Substantial factual overlap between the original allegations and the new allegations, the touchstone of *American Pipe* analysis, remains essential, but with a sufficient factual nexus to ensure fair notice to defendants, tolling is permitted.[16]

Defendants' stance that tolling is prohibited for all allegations outside the class period is therefore groundless.  As their own authorities indicate, however, a more limited proposition is true: allegations outside the class period that address conduct or harm completely unrelated to conduct or harm that occurred within the class period are untimely.  *See Shak*, 156 F. Supp. 3d at 476 (finding claims untimely where "the conduct alleged . . . appears to have postdated all of the conduct on which the class case was based"); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 486 (S.D.N.Y. 2014) (declining to toll the claims of plaintiffs whose only purchase of allegedly manipulated securities came after the end of the class period); *Mass. Bricklayers & Masons Funds v. Deutsche Alt-A Secs.*, 273 F.R.D. 363, 366 (E.D.N.Y. 2011) (finding the claims of a plaintiff that "did not purchase securities" until the class period had closed untimely because its claims "were never raised in this matter").  In other words, new allegations of misconduct by defendants or injury to plaintiffs never encompassed by and unrelated to the allegations of the putative class cannot be tolled, even by former putative class members with claims that are appropriately included in the putative class.

---

[16]     Plaintiffs' suggestion that claims outside the class period are tolled "so long as the claims are based on the same legal theory and are alleged against the same defendants," Pls.' Omnibus Opp'n at 15 (citing *Renati*, 2019 WL 5536206, at *13); NYK Pls.' Opp'n at 14 (same), overshoots the mark.  A factual, not just a legal, nexus is required.

Against this backdrop, defendants' challenges to plaintiffs' pre-2003 and post-2008 allegations are examined.  Specifically, defendants seek to dismiss or strike: (1) allegations by omnibus plaintiffs that the conspiracy continued after December 31, 2008; (2) allegations by NYK plaintiffs that defendants' collusion began in 2000; (3) allegations by NYK plaintiffs that contracts they entered with defendants after December 31, 2008 provided for inflated fuel surcharges; and (4) allegations by Kawasaki and Yang Ming plaintiffs that the conspiracy continued until 2012.  Each set of allegations outside the class period are discussed in turn.

### a.   Omnibus Plaintiffs' Post-2008 Allegations

In addition to their post-2008 allegations related to mileage-based fuel surcharges, which, as explained *supra* Part III.D.2, are time-barred, omnibus plaintiffs allege that defendants have engaged in "ongoing coordination of prices," AM Compl. ¶ 96, "through the present," *id.* ¶ 106, continue to "overstate[] their actual fuel costs," *id.* ¶ 95, and "have continued to communicate and collude regarding rail freight services and rates after 2007," including through AAR membership and attendance at industry gatherings, with "[t]he ultimate objective" of "rais[ing] total rail freight rates," *id.* ¶ 98.  Given that omnibus plaintiffs allege that defendants gradually abandoned the rate-based fuel surcharges at the center of their 2003–2008 conspiracy in favor of mileage-based fuel surcharges after 2007, *see, e.g.*, *id.* ¶ 93 ("[Norfolk Southern] switched over to a mileage-based fuel surcharge."), the bulk of their post-2008 allegations are best read as advancing a theory that the conspiracy from 2008 to the present was a conspiracy to fix artificially high mileage-based fuel surcharges.  This theory is time-barred.  *See supra* Part III.D.2.a.

Omnibus plaintiffs counter that "'[c]onspiracy is a crime that presumes continuity until accomplishment or termination'" and, absent any allegation by the putative class that the conspiracy was terminated or defendants withdrew, the conspiracy is "presumed as a matter of

law to have continued."  Pls.' Omnibus Opp'n at 15 (alteration in original) (quoting *United States v. Moore*, 651 F.3d 30, 90 (D.C. Cir. 2011)).  Plaintiffs' reliance on the concept of withdrawal puts the cart before the horse.  Withdrawal is an affirmative defense available to defendants charged with an illegal conspiracy to rebut the presumption of continuity only after plaintiffs have carried their initial burden of adequately pleading, and later of proving, the existence and duration of the conspiracy.  *See, e.g.*, *Moore*, 651 F.3d at 90 (stating that the presumption of continuity begins "once the government *proves* that a defendant was a member of an ongoing conspiracy" (emphasis added)); *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 457 (6th Cir. 2011) (adopting, in the civil context, the rule from criminal antitrust law that "'once a conspiracy has been established, it is presumed to continue until there is an affirmative showing that it has been abandoned'") (quoting *United States v. Hayter Oil Co.*, 51 F.3d 1265, 1270–71 (6th Cir. 1995)).

Omnibus plaintiffs therefore cannot establish the length of the conspiracy by making a blanket assertion that because defendants' post-2007 conduct "did not constitute a withdrawal," the conspiracy continues.  AM Compl. ¶ 93.  They must meet their obligation adequately to plead the entire conspiracy period.  *See, e.g.*, *Nypl v. JPMorgan Chase & Co.*, No. 15 Civ. 9300 (LGS), 2018 WL 1276869, at *4 (S.D.N.Y. Mar. 12, 2018) ("'Courts have dismissed claims that are outside part of a claimed class period where there are no specific facts establishing the existence of a conspiracy for the entire time period alleged.'") (quoting *Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08 Civ. 42, 2015 WL 4987751, at *5 (E.D.N.Y. Aug. 19, 2015)).  For the post-2008 period, omnibus plaintiffs cannot carry this burden because, by their own admission, the conspiratorial conduct they allege during this time was "differentiated" from defendants' 2003–2008 conduct through the transition to mileage-based

fuel surcharges.  AM Compl. ¶ 93; *see also id.* ¶ 96 (acknowledging "changes to [defendants']
Inflated Fuel Surcharge programs" after 2007).  Those allegations of differentiated conduct are
time-barred, regardless of whether defendants withdrew from the conspiracy.

While omnibus plaintiffs' post-2008 allegations of new conspiratorial conduct after 2008
are untimely, their other post-2008 allegations add detail to their theory of the 2003–2008
conspiracy, including, for example, their allegation that defendants continued to communicate
about rail freight services and rates through the AAR and other industry forums.  These
allegations simply set forth a more complete picture of how the conspiracy alleged by the
putative class was able to operate, without altering the scope of defendants' potential liability.
Defendants were therefore on notice of the underlying conduct they challenge and suffer no
prejudice from inclusion of these allegations in omnibus plaintiffs' complaints.

### b.  NYK Plaintiffs' Pre-2003 and Post-2008 Allegations

NYK plaintiffs allege that they first paid artificially inflated prices for rail freight
transport "no later than 2000," NYK Compl. ¶ 95, as a result of collusion among defendants to
fix rate-based fuel surcharges "since at least 2000," *id.* ¶ 1.  By alleging that the conspiracy
began in 2000, NYK plaintiffs advance a different factual theory of the conspiracy than did the
putative class, which in fact alleged that defendants' conduct from 2000 to 2003 was unilateral,
not coordinated, *see* Class Compl. ¶ 57 ("Prior to 2003 . . . each of the [d]efendants had different
fuel surcharge rates."), and allege conspiratorial conduct several years before the earliest conduct
alleged in *MDL I.*  These plaintiffs therefore "could not have reasonably relied" on the class
action, which always challenged conduct beginning in early 2003, "to represent their interests"
as to the pre-class conduct.  *Shak*, 156 F. Supp. 3d at 476.  NYK plaintiffs' claims of
conspiratorial conduct or for relief for alleged harm from 2000–2003 are untimely.

NYK plaintiffs further allege that a contract they entered with defendants in 2009 for rail freight services from 2009 to 2013 included "the same [inflated rate-based fuel surcharge] formula which applied in the contracts during 2000 to 2008" and therefore caused NYK plaintiffs to pay inflated rates for rail freight services purchased under this agreement.  NYK Compl. ¶ 96.  This allegation sets forth a theory that defendants engaged in conspiratorial conduct outside the class period that was not litigated by the putative class and would require new evidence and discovery.  NYK plaintiffs frame this allegation as just another part of its post-2008 damages claim, such that any requisite discovery and expanded liability do not defeat tolling.  *See* NYK Pls.' Opp'n at 15–16.  The burden imposed by this allegation, and disapproved of by *American Pipe*, is not merely that of additional discovery or the need to prove expanded liability, as plaintiffs suggest.  *See id.* (collecting cases).  This assertion, instead, springs an unfair surprise on defendants by adding conduct that is factually separate from the 2003–2008 conspiracy pursued by the putative class.  To the extent that new discovery would be required to establish this allegation, it only bolsters this conclusion.  NYK plaintiffs' allegations about the 2009–2013 contract are time-barred.[17]

### c. Kawasaki and Yang Ming Plaintiffs' Post-2008 Allegations

Kawasaki and Yang Ming plaintiffs allege, without any elaboration, that "[d]efendants engaged in price fixing . . . including by fixing rate-based rail fuel surcharges . . . and/or . . . continued to reap the benefits of the anticompetitive scheme (in the form [sic] supra-competitive

---

[17]     In the absence of *American Pipe* tolling, NYK plaintiffs attempt to save their post-2008 allegations by arguing that they "relate back" to the Class Complaint within the meaning of Fed. R. Civ. P. 15(d), *see* NYK Pls.' Opp'n at 17–19, which allows a party to file supplemental pleadings raising untimely, novel allegations "setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented," FED. R. CIV. P. 15(d).  NYK plaintiffs' complaint in this MDL is not a "supplemental pleading" in relation to the Class Complaint, but rather the beginning of a new and distinct lawsuit.  NYK plaintiffs therefore cannot claim the protection of Rule 15(d) for their untimely claims.  The substantially similar argument raised by Kawasaki and Yang Ming plaintiffs, *see* Kawasaki & Yang Ming Pls.' Opp'n at 16–17, fails for the same reason.

fuel surcharges) for years after [d]efendant's collusion-tainted contracts were negotiated," until "at least September 30, 2012," Kawasaki Compl. ¶ 2, and "at least December 31, 2012," Yang Ming Compl. ¶ 2.  To the extent that Kawasaki and Yang Ming plaintiffs simply allege that they experienced harm from the July 1, 2003 to December 31, 2008 conspiracy until 2012 through defendants' "use of multiyear contracts" negotiated during the class period, Kawasaki Compl. ¶ 2, the allegations are tolled, as explained above.  On the other hand, to the extent that Kawasaki and Yang Ming plaintiffs assert a theory that defendants engaged in conspiratorial conduct outside the class period that resulted in harm to plaintiffs beyond December 31, 2008, their allegations are time-barred.  *See Shak*, 156 F. Supp. 3d at 476.

> ### E.        Neither Dismissal Nor Striking Is Warranted

Defendants contend that the novel factual allegations discussed above render the allegations of omnibus plaintiffs and NYK plaintiffs so factually distinct from the those of the putative class that these plaintiffs have "given up the benefit of *American Pipe* tolling by filing a very different case than the one asserted by the putative class."  Defs.' AM Mem. at 2; *see also* Defs.' NYK Mem. at 2 ("With a conspiracy claim that is fundamentally different than the conspiracy alleged in *MLD I*, the Court should dismiss [p]laintiffs' Complaint in full because the statute of limitations has long expired for this new claim.").  They therefore move to dismiss these seven complaints in their entirety.  *See, e.g.*, Defs.' AM Mot at 1; Defs.' NYK Mot. at 1.  Plaintiffs counter that this position is "baseless" because, at a minimum, the putative class and plaintiffs allege a conspiracy among defendants to impose inflated rate-based fuel surcharges, implemented through the AAR's adoption of the AIILF, that lasted through 2007.  Pls.' Omnibus Opp'n at 9; *see also* NYK Pls.' Opp'n at 6–8.  They further argue that *American Pipe* tolls the statute of limitations with respect to these overlapping claims.

60

Plaintiffs correctly characterize defendants' position. The availability of tolling under *American Pipe* is not, as defendants would have it, an all-or-nothing proposition. Rather, a former putative class member benefits from tolling to the extent that the class proceedings provided defendants with fair notice of "aspects of [plaintiffs'] claims" or "portion[s] of [plaintiffs'] complaint[s]." *McCarthy*, 562 F.2d at 1275. The *American Pipe* rule can thus render some, none, or all of a former putative class member's allegations timely, contingent on "the breadth of the notice provided" in the class proceedings. *Id.* *MDL I* provided defendants with ample notice of omnibus and NYK plaintiffs' allegations that defendants increased overall rail freight rates during the time period from 2003–2008 by conspiring to cause the AAR to adopt a new rate adjustment index, the AIILF, that excluded the cost of fuel and subsequently agreeing to implement identical, artificially high rate-based fuel surcharges. *See, e.g.*, Class Compl. ¶¶ 2–15. Defendants have now spent over a decade actively litigating these exact allegations in *MDL I* and certainly "have received sufficient notice of the contours" of plaintiffs' "potential claims" with respect to the alleged 2003–2008 rate-based fuel surcharge conspiracy. *McCarthy*, 562 F.2d at 1275. Further, these overlapping allegations involve the "same evidence, memories, and witnesses" as the putative class action, *Am. Pipe*, 414 U.S. at 562 (Blackmun, J., concurring), and defendants do not suggest that litigating these claims would otherwise prejudice them. To the contrary, defendants concede that under *American Pipe*, the Clayton Act's four-year statute of limitations was tolled for precisely these claims in the eighty-two *MDL II* complaints that they have answered or intend to answer and will litigate in this MDL. *See* Defs.' AM Mem. at 9; Defs.' Consol. Reply at 3–4.

Defendants contend that *American Pipe* tolling cannot apply "when a later-filing plaintiff alleges . . . 'a new factual theory'" as the basis for their legal claim. Defs.' Consol. Reply at 5

(quoting *In re Libor-Based Fin. Instruments Antitrust Litig.*, 2015 WL 4634541, at *135).[18]

Plaintiffs, they assert, have fallen into this trap by "alleg[ing] the same formal legal cause of action (*i.e.*, a violation of Sherman Act § 1) on very different facts." *Id.* at 6. Yet, as described above, plaintiffs have in fact pled the same facts as the putative class. Some novel factual allegations feature in omnibus plaintiffs' and NYK plaintiffs' complaints, but claims raised by former putative class members need not be identical to those alleged by the putative class to be tolled. *See, e.g.*, *Tosti v. City of Los Angeles*, 754 F.2d 1485, 1489 (9th Cir. 1985) (applying *American Pipe* tolling where the original and the new litigation against defendant involved most, but not all, of the same factual allegations, which gave the defendant "ample notice of the nature" of the plaintiff's claims); *Town of Princeton*, 202 F. Supp. 3d at 195 (explaining that "the claims of a subsequent plaintiff" need only "be sufficiently similar to the claims brought by the failed class" (internal quotations omitted)). The new allegations notwithstanding, the substantial overlap between the allegations of the putative class and those of omnibus and NYK plaintiffs is more than sufficient to defeat defendants' effort to dismiss their claims in their entirety. Defendants' motions to dismiss these seven complaints are denied.

---

[18]    Defendants further rely on *Supreme Auto Transport, LLC v. Arcelor Mittal USA, Inc.*, 902 F.3d 735 (7th Cir. 2018), and *Angel v. Federal Home Loan Mortgage Corp.*, No. 18-cv-01142, 2019 WL 1060805 (D.D.C. Mar. 6, 2019), in both of which the courts dismissed complaints as time-barred, denying those plaintiffs the benefit of *American Pipe* tolling. *See* Defs.' AM Mem. at 9–10; Defs.' NYK Mem. at 8–9. The complaints found untimely in these cases are not at all analogous to the instant complaints. The plaintiff class in *Supreme Auto* dramatically altered the identity and composition of the putative class from a class of direct purchasers of steel mill outputs, 902 F.3d at 739, to a class of indirect purchasers, including consumer purchasers, *id.* at 742. The new suit thus introduced "substantial prejudice to defendants," who received no notice of claims of this breadth from the original litigation. *Id.* Likewise, the *Angel* court declined to toll the statute of limitations under *American Pipe* for untimely claims brought by a former putative class member who named as the primary defendants individuals who were not parties to the previous class action and who conceded that his claims were "markedly different" from those of in the original case. *Angel*, 2019 WL 1060805, at *6. In both cases, the new action was so distinct in kind that the original suit could not have provided defendants with fair notice of any of the claims against them. Here, in contrast, despite the addition of some new factual allegations, the crux of the challenged complaints and the allegations of the putative class are the same: the alleged conspiracy among defendants to drive the adoption of the AIILF, a fuel-exclusive cost-escalation index that would allow them to use fuel surcharges as a means to increase overall rates.

In their motions to dismiss, defendants raise a second 12(b)(6) argument, that plaintiffs'
allegations were inadequately pled with respect to the allegations "that were never raised" in
*MDL I.*  Defs.' AM Mem. at 17; Defs.' NYK Mem. at 11–12; Defs.' Kawasaki & Yang Ming
Mem. at 10–11; Defs.' Anheuser-Busch Mem. at 12–14.  As explained *supra* Part III.B,
however, plaintiffs must adequately plead their claim for relief based on allegations taken as
whole, even if some allegations in isolation may be time-barred.  Analysis is thus restricted to
whether plaintiffs have alleged sufficient facts to plead their single claim that defendants
conspired in violation of the Sherman Act and the Clayton Act.  The *MDL I* court found more
than a decade ago that the substantially similar claim raised by the putative class in *MDL I* was
sufficiently pled to survive a motion to dismiss, *see MDL I–D.D.C. 2008 Op.*, 587 F. Supp. 2d at
32–37, and defendants do not argue this point.

Defendants challenge plaintiffs' allegations of a conspiracy lasting beyond the class period
as "inadequately pled" because plaintiffs have not pled sufficient facts to raise the inference that
the conspiracy extended past December 31, 2008.  Defs.' Kawasaki & Yang Ming Mem. at 10.
To be sure, in antitrust conspiracy cases, a plaintiff must plead "'enough factual matter (taken as
true) to suggest an agreement was made,'" *Oxbow Carbon & Mins. LLC v. Union Pac. R.R.
Co.*, 81 F. Supp. 3d 1, 10–11 (D.D.C. 2015) (quoting *Twombly*, 550 U.S. at 556), and must make
"specific allegations of conspiratorial activity" for the entire time period alleged "to raise the
inference that the conspiracy extended" until the end date the plaintiff alleges, *Precision Assocs.,
Inc.*, 2015 WL 4987751, at *5 (citing *Iqbal*, 556 U.S. at 678).  As already found, except to the
extent that they allege continuing harm from the 2003–2008 conspiracy, plaintiffs' post-2008
allegations are time-barred for purposes of potential damages, *see supra* Part III.D.3, but

nonetheless may provide relevant historical background or context for the alleged 2003–2008 conspiracy.

As an alternative to dismissal, defendants move to strike plaintiffs' new factual allegations under Rule 12(f).  *See* Defs.' AM Mot. at 1; Defs.' Gerdau Mot. at 1; Defs.' Int'l Paper Mot. at 1; Defs.' Dow Mot. at 1; Defs.' Union Carbide Mot. at 1; Defs.' GenOn Mot. at 1; Defs.' NYK Mot. at 1; Defs.' Kawasaki & Yang Ming Mot. at 1; Defs.' Anheuser-Busch Mot. at 1.  Granting a Rule 12(f) motion is generally disfavored, as discussed *supra* Parts II.B and III.B, and defendants fail adequately to explain how any of plaintiffs' allegations meet the extraordinarily high standard required by this rule, particularly since the challenged allegations, though novel in certain respects, primarily serve to bolster the allegations of the 2003–2008 conspiracy litigated by the putative class.  Defendants' motions to extend the drastic remedy of striking to allegations that are neither scandalous nor prejudicial, nor obviously immaterial or impertinent, are denied.

## IV.     CONCLUSION

The claims and underlying factual allegations asserted in the ten complaints subject to defendants' motions to dismiss or, alternatively, to strike, are generally not time-barred.  The limitations period is tolled, as provided by *American Pipe,* because plaintiffs are former putative class members of earlier class proceedings in *MDL I* and their claims fall within the scope of the class sought to be certified in *MDL I*.  Thus, for those allegations encompassed by *MDL I*, defendants received adequate notice of the subject matter, such that they were aware of the need to preserve relevant evidence, and continued litigation of those allegations at this late date poses no unfair surprise.  At the same time, certain novel factual allegations that vary significantly from allegations in *MDL I* are time-barred, including the novel factual allegations that: (1) three

other railroads, CN, CP, and KCS, participated as co-conspirators; (2) defendants conspired to implement uniform, artificially high mileage-based fuel surcharge; and (3) defendants engaged in conspiratorial conduct outside the class period of July 1, 2003 to December 31, 2008, including NYK plaintiffs' allegation that defendants inserted artificially high fuel surcharges in a contract negotiated in 2009 and Kawasaki and Yang Ming plaintiffs' allegations that defendants conspired after 2008.  Plaintiffs cannot recover damages stemming from these allegations, but defendants' motions to strike them are denied.  The novel allegations bolster and expand upon the central claim of both plaintiffs and the putative class in *MDL I*, that defendants unlawfully conspired to increase rail freight rates through artificially inflated fuel surcharges from July 1, 2003 to December 31, 2008.  They are relevant to plaintiffs' claim and therefore do not meet the extraordinarily high standard to strike under Rule 12(f).

Accordingly, defendants' motions for dismissal of complaints filed by omnibus plaintiffs and NYK plaintiffs, and for partial dismissal of complaints filed by Kawasaki and Yang Ming plaintiffs and Anheuser-Busch plaintiffs, all ten of which state the same legal claim based on substantially the same facts as the *MDL I* class, are denied and defendants' motions to strike certain allegations in all ten challenged complaints are denied.

An Order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: August 25, 2020

_____
BERYL A. HOWELL
Chief Judge